**Allen J. DRESCHER, as Trustee of Little Compton Realty Trust**

v.

**Sigurd W. JOHANNESSEN.**

**No. 2010–269–Appeal.**

Supreme Court of Rhode Island.

July 5, 2012.

Derming E. Sherman, Esq., for Plaintiff.

Gerald J. Petros, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

Before this Court is the plaintiff's appeal of a Superior Court judgment declaring that the plaintiff, Allen J. Drescher (Drescher or plaintiff), failed to establish an easement by prescription over a right-of-way owned by the defendant, Sigurd W. Johannessen (Johannessen or defendant). In the trial court, Drescher was equally unsuccessful in his attempt to prove that the right-of-way at issue also constituted a dedicated public road. Though mindful of Drescher's intermittent use of the disputed right-of-way for almost twenty-five years to access his property, we find no error in the trial justice's determination that Drescher failed to demonstrate the requisite elements for a prescriptive easement by clear and convincing evidence. We likewise hold that the trial justice arrived at the proper conclusion in finding that the right-of-way was not a public road. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

At the heart of this matter lies a right-of-way, used as a driveway, to access certain properties located in the Town of Little Compton, Rhode Island. Drescher and Johannessen own adjacent parcels situated along the right-of-way. Drescher's real estate, which he acquired in 1984 with a former business partner, is located at 241 West Main Road and is further identified as lot 6 on the Little Compton Tax Assessor's Plat 3 (lot 6).[1] Lot 6, also known by its informal moniker, "Summer Farm," comprises roughly fifty acres, with 523 feet of frontage adjacent to West Main Road. Johannessen's property, at approximately 5.85 acres in size, is contiguous to the southern border of lot 6 and is located at 247A West Main Road. Identified as lot 7–3 and lot 7–4 on the abovementioned plat, Johannessen's property[2] is accessible via a

---

1. Drescher is the sole remaining trustee of Little Compton Realty Trust, which owns lot 6. For the purposes of this opinion, we shall refer to Drescher as the owner of that lot.

2. Johannessen's property was formerly designated as lot 7–1 prior to a subdivision of the land in 2004. For simplicity's sake, we will reference his property as lot 7. Johannessen acquired lot 7 from Ward W.S. Hough (Mr.

forty-foot-wide "roadway" (the right-of-way) that originates from West Main Road and proceeds along the southerly border of lot 6 for 765 feet, before continuing southerly and westerly within Johannessen's parcel.

The parties do not dispute that Johannessen holds record title to the right-of-way; however, the parties' notions diverge as to whether Drescher has a legal right to use the way to access lot 6 at various points, despite having direct access to lot 6 from West Main Road. As a corollary of this discordance, Drescher filed his three-count complaint in Newport County Superior Court on October 13, 2006, amended later that December, in which he sought to quiet title and interest in the right-of-way, requested a declaration of his rights, and pursued injunctive relief to enjoin Johannessen and his successors-in-interest from preventing Drescher's use of the entire right-of-way.[3] In response, Johannessen asserted a counterclaim for trespass.

Drescher waged his legal battle on two fronts—his claim to an easement by virtue of prescription and his right to use the way as a dedicated public road. The sufficiency of Drescher's claims was tested in a bench trial before a Superior Court justice over four days in February 2009. Nine witnesses testified about Drescher and his agents' use of the right-of-way, as well as the use and observations of neighbors and workers. Testimony was also adduced in regard to the specification of the right-of-way on certain subdivision plans. Drescher himself was the first witness called to chronicle his usage of the right-of-way. Recalling his initial acquisition of lot 6, Drescher explained that the expansive parcel was scattered with deteriorated and damaged residential and agricultural structures, but consisted primarily of fields and wooded land. He recounted that, although lot 6 was accessible by the main gate fronting West Main Road, he began using the right-of-way to access his property, upon purchasing it in 1984, via three smaller offshoot-like "driveways." He also relayed that at the time of purchase, neighboring lot 7 was undeveloped, that he was unaware of who owned lot 7 or the right-of-way, and that no one advised him that his use of the right-of-way was not permitted. According to Drescher, there was no barrier along the boundary of lot 6 and the right-of-way, and the boundary always remained open.

Drescher further detailed his use of the right-of-way and his activities on lot 6 over his nearly twenty-five years of ownership. Asserting that he had visited lot 6 continuously since 1984, Drescher estimated such visitation at "7[00] or 800 times, at least," over that period. Drescher acknowledged that he, as well as people who performed clearing and repair work for him,[4] regularly and openly used the right-of-way without permission to access lot 6. Although the main gate remained a viable entry point to lot 6 during this period, Drescher clarified at trial that the gate installation was often locked for security purposes. Thus, the workers intermittently brought in for clearing, cleanup and construction efforts sometimes used the main gate, but more frequently used the three driveways stemming from the right-of-way. Drescher described the clearing work to have

Hough) in 2006, the original defendant named in this case.

**3.** Prior to filing his complaint, Drescher apprised Mr. Hough, who was still the owner of lot 7 at that time, of his claim of right via a letter sent by his attorney. He also filed a notice of *lis pendens* on lot 7 in the town's land evidence records.

**4.** At trial, Drescher indicated that employees of his own company, as well as outside contractors, performed certain clearing and construction activities on lot 6.

substantially occurred in the "early periods" of his ownership of lot 6, including "a vigorous attempt" to clear debris after a hurricane in 1986, with further activity transpiring at "intermittent, sporadic [and] random times[.]" In regard to construction activities, Drescher testified that "substantial renovation activities" had occurred in the three to four years prior to trial.

In addition to the clearing and construction activities, Drescher expounded on the agricultural use of lot 6 by a local farmer named Coll Walker (Mr. Walker), whom Drescher permitted to use certain areas of lot 6 to grow fruits and vegetables. Drescher testified that to his knowledge, Mr. Walker farmed portions of lot 6 continuously since Drescher's acquisition of the property, and that Mr. Walker accessed lot 6 using the right-of-way at issue, particularly to bring in his tractors and farm equipment. On cross-examination, Drescher acknowledged that he knew Mr. Walker also farmed other properties, including lot 7.[5]

Also on cross-examination, Drescher admitted that his visits to lot 6 took place on a periodic but unpredictable basis—occasionally with weeks, but never more than a month, elapsing between such sojourns. He further acknowledged that he sometimes used the main gate and sometimes used the right-of-way. In addition, Drescher confirmed that he did not physically alter, obstruct or block the right-of-way, nor interfere with others' use of the way; specifically, use by the owners of nearby lot 7–2, who held an express easement over the right-of-way.[6] When questioned about certain subdivision plans submitted to the town's planning board by Drescher's daughter on his behalf—which plans depicted a new road on lot 6, at some points running parallel to the right-of-way at issue,—Drescher replied that such plans had been "abandoned." Drescher also conceded that nothing in those plans, submitted in 2006, depicted the accessibility of lot 6 via the disputed right-of-way.

The next witness to testify was Mr. Jack Gaspar, who served as Drescher's longtime superintendent for various properties. Mr. Gaspar recalled that his first visit to lot 6 occurred in late 1987, to evaluate the extent of damage to the property and its structures from the earlier hurricane and to coordinate what he termed a "major cleanup." In furtherance of this cleanup and repair effort, Mr. Gaspar, with a crew of workers and assorted equipment, attended to the property three to four times a week in the months to follow. Mr. Gaspar maintained that he was "very involved in [the] property" up until 1999 or 2000, citing vegetation-clearing activities and roofing efforts beginning in 1993 or 1994. At trial, Mr. Gaspar recalled that he and his crew accessed lot 6 using the three driveways extending from the disputed right-of-way on a continual basis since 1987. Apparently, Mr. Gaspar filled potholes and cleared briars in the right-of-way at the request of the former owner of lot 7–2, a Dr. Petit, from 1994 until 1999 or 2000. Although the frequency of Mr. Gaspar's visits to lot 6 from 1987 to 2009 is not entirely evident from his testimony, he did

---

5. During cross-examination, Drescher was confronted with his earlier deposition testimony, in which he expressed that he had assumed Mr. Walker had permission from Mr. Hough to use the right-of-way to access lot 7.

6. Lot 7–2 is situated to the west of lot 7 and to the south of lot 6. In 1986, lot 7 was subdivided into lot 7–1 and lot 7–2. The then owner of lot 7, Mr. Hough's mother, granted to the purchaser of lot 7–2, otherwise landlocked, an express easement over the right-of-way at issue. Lot 7–1 was later subdivided into lot 7–3 and lot 7–4 in 2004.

clarify that the period of most frequent visitation occurred from 1993 to 1999.

The last witness to testify in support of plaintiff's case was Ms. Jane Cabot, a nearby resident who, during the course of her life, had lived on various properties in the area. Ms. Cabot testified to her own use of the right-of-way to visit lot 6 and lot 7–2, as well as her observations over the years about certain farmers' use of the right-of-way to bring in trucks and tractors, particularly that of Mr. Walker. Because Ms. Cabot also served as president of the Little Compton Town Council, which at one time acted as the planning commission, she also testified about the subdivision plans signed by her and approved by the council in connection with the 1986 subdivision of lot 7. Specifically, Ms. Cabot stated that the right-of-way depicted on the approved subdivision plot plan was considered by the planning commission to be "a dedicated right-of-way."

Following Drescher's presentation of evidence, Johannessen moved for judgment as a matter of law; after argument on the motion, the trial justice reserved his ruling, and Johannessen proceeded with his defense. Johannessen called six witnesses, whose testimony was offered to highlight what he alleged as inconsistent and sporadic use of the right-of-way by Drescher and his workers, and to show that the right-of-way was not a public road. First to testify was Mr. Stetson Eddy, an attorney who represented Mr. Hough in connection with the 2004 subdivision and the sale of lot 7 to Johannessen, and who also represented Mr. Hough's mother, the prior owner of lot 7, in the 1986 subdivision. Attorney Eddy recalled that in working on the 1986 subdivision, he was not informed of an intent to designate the right-of-way as a public road, nor did he believe the 1986 subdivision plan to designate the way as dedicated. Having

hunted on the land in question during the 1980s, attorney Eddy also testified in regard to his personal observations about the disputed right-of-way, recounting having "rarely observed" anyone advantaging themselves of the route during that time. However, he estimated his hunting-trip frequency at half a dozen times per hunting season.

At trial, Johannessen also offered the testimony of the land surveyor, James Amarantes, who prepared the plot plan for the 1986 subdivision of lot 7. Mr. Amarantes explained that at the time he drew up the plans, the area designated as a proposed road—the right-of-way—was akin to "a cart path" and did not meet the specifications for a subdivision road under the town's subdivision provisions.

In support of his defense, Johannessen also called two farmers to testify—Wayne Montgomery (Mr. Montgomery), a nearby potato farmer, and Mr. Walker, the farmer who tilled portions of lots 6 and 7. Mr. Montgomery, a life-long resident of the town, testified that he was familiar with lots 6 and 7, and that he had driven by lot 6 along West Main Road four times a day for twenty years while commuting to and from work. According to his observations, there was very little activity on lot 6 or the right-of-way until five to six years prior to trial, aside from Mr. Walker's farming endeavors.

Subsequently, Mr. Walker testified to his own agricultural activities on lots 6 and 7, estimating the origin of his activities at some point between 1978 and 1980. Mr. Walker acknowledged using the right-of-way to access both lot 6 and lot 7, with specific permission from Johannessen's predecessor-in-interest to use it to access lot 7. During farming season, which generally spanned April to November, Mr. Walker attended to the properties at least five times a week. According to Mr.

Walker, cleanup efforts within lot 6 appeared "sporadic" and ensued during one to two periods a year; however, he observed a significant increase in activity in the three years prior to trial. On cross-examination, Mr. Walker indicated that during the farming season, he attended to a total of six to eight properties, thus limiting his observation of activities on lot 6. He also confirmed that he did not have explicit permission from Johannessen's predecessor-in-interest to use the right-of-way for access to lot 6 for farming purposes, only permission to use it to enter lot 7.

The last defense witness to testify was Mr. Hough, the previous owner of lot 7. Mr. Hough recollected his attendance at lot 7 as limited, from once or twice a year during the 1990s, and up to seven times a year from 1999 to 2006. He characterized lot 6 as "unimproved" until three years prior to trial. He also testified about his farming arrangement with Mr. Walker, explaining that he permitted Mr. Walker to use the right-of-way to access lot 7 and was "okay" with the farmer using the way to also access lot 6. Additionally, Mr. Hough described the use of the right-of-way by another neighbor, Richard Humphrey (Mr. Humphrey), for about six months in 1998, during which time that neighbor removed a portion of a stone wall bordering the right-of-way to bring in construction equipment. Mr. Hough admitted that he did not prevent this brief use and recalled that Mr. Humphrey later closed off the gap with a rail fence. In regard to the 2004 subdivision of lot 7, Mr. Hough asserted that it was not his intent to dedicate the right-of-way at issue to the town or to the public.

After the presentation of evidence,[7] the trial justice ordered the parties to submit to the court proposed findings of facts and conclusions of law. The parties complied, and the trial justice ultimately rendered a written decision on July 20, 2010. In his decision, the trial justice determined that, although the evidence presented at trial established Drescher's "actual" use of the right-of-way, the evidence did not clearly and convincingly confirm use that was open, notorious, hostile, under claim of right, and continuous for a period of ten years. Specifically, the trial justice found both attorney Eddy and Mr. Walker's "accounts of [Drescher's] infrequent use" to be credible, and highlighted testimony indicating that only in the few years prior to trial had Drescher's activity on lot 6 developed a persona of regularity. The trial justice also emphasized the testimony of Mr. Gaspar; noting that it "weigh[ed] strongly against a finding of hostility" because it evidenced his receipt of permission to use the right-of-way to access lot 6 from Dr. Petit, the owner of lot 7–2, who had a deeded easement over the right-of-way. The trial justice considered Mr. Gaspar's repair work along the right-of-way as suggestive of payment to Dr. Petit for the privilege of such use. Likewise, the trial justice found Mr. Walker's use of the right-of-way to be permissive, and that Drescher and Mr. Gaspar used the way in a manner similar to Mr. Walker's "known permissive use." Additionally, the trial justice found Drescher's proposed subdivision plans, albeit abandoned, to diminish his claim of right to use the right-of-way, because the plans depicted the proposed construction of a new road and did not designate any access points to lot 6 along the disputed right-of-way. In regard to

---

7. We note that the parties also submitted certain deposition testimony of two unavailable witnesses—Drescher's former partner, Arthur Murphy, and Michael Mello, the town's high-way supervisor. We further acknowledge that the trial justice, at the request of defendant, participated in a view of the real estate at issue.

Drescher's alleged continuous and uninterrupted use of the right-of-way, the trial justice determined that Drescher failed to sufficiently establish any ten-year period of such use. Thus, the trial justice concluded that Drescher failed to prove an easement by prescription.

In his decision, the trial justice also considered Drescher's claim that the right-of-way constituted a public road. In light of the documentary and testimonial evidence presented at trial, the trial justice determined that "[t]he evidence * * * overwhelmingly show[ed] that the owners of lot 7, the Houghs, subdivided lot 7 into smaller parcels, each benefited by an appurtenant easement, a 'Private R.O.W.', not a public way." He further found that the evidence did not demonstrate that the right-of-way equated to a public dedication because the use by persons other than the parties was permissive in nature. Moreover, the trial justice noted, such use was undertaken by neighbors, and not by members of the general public. Also, without questioning the credibility or accuracy of Ms. Cabot's testimony, the trial justice stood unconvinced "that [Ms.] Cabot's belief that the [right-of-way] was a public road [was] sufficient to sustain a finding of public dedication."

Accordingly, the Superior Court declared that Drescher held no prescriptive rights in the right-of-way, and further declared that the right-of-way was not a public road. Final judgment was entered on July 27, 2010,[8] from which Drescher timely appealed.

## II

### Issues on Appeal

On appeal, Drescher maintains that the evidence adduced at trial clearly and convincingly proved his prescriptive use of the right-of-way sufficient to establish an easement. He contends that the trial justice erroneously determined that Drescher and his invitees' use of the right-of-way to access lot 6 was not open and notorious, because, in his view, such use was performed openly and was not permissive in nature. In a similar fashion, Drescher deems as error the trial justice's finding that such use was not under a claim of right because, as he maintains, his invitees consistently and openly used the right-of-way for almost twenty-five years "as if they had a right to do so." Drescher likewise challenges the trial justice's determination that his use was not hostile—particularly, his finding that Mr. Gaspar received permission to use the right-of-way from the owner of lot 7–2. Because Dr. Petit did not own the right-of-way, and benefited from merely a deeded easement, Drescher maintains that Dr. Petit was without authority to confer permission. In addition, Drescher argues that the trial justice erred in finding that the evidence failed to establish satisfaction of the necessary prescriptive period because the testimony elicited at trial proved continuous use.

The second prong of Drescher's appeal pertains to the trial justice's declaration that the right-of-way was not a public road. Regarding this finding as error, Drescher contends that the pertinent subdivision plats unambiguously reveal an intent to dedicate the right-of-way as a public road. Drescher further argues that the testimony at trial demonstrated public acceptance of the right-of-way as a public road, and that the trial justice's contrary determination—that all use of the way was permissive—was at variance with the evidence presented.

---

**8.** Judgment was also granted in favor of Johannessen on his counterclaim.

## III

## Standard of Review

[1–3] This Court "will not disturb the findings of a trial justice sitting without a jury in a civil matter 'unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" *Nye v. Brousseau*, 992 A.2d 1002, 1008 (R.I.2010) (quoting *Union Station Associates v. Rossi*, 862 A.2d 185, 193 (R.I. 2004)). "This Court's review of the factual findings of a trial justice sitting without a jury is deferential." *Hilley v. Lawrence*, 972 A.2d 643, 648 (R.I.2009) (citing *Grady v. Narragansett Electric Co.*, 962 A.2d 34, 41 (R.I.2009)). We likewise accord great deference "to the trial justice's 'resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence'" in a nonjury case. *Nye*, 992 A.2d at 1008 (quoting *Houde v. State*, 973 A.2d 493, 498 (R.I.2009)). However, we apply a *de novo* review to pure questions of law that are raised on appeal. *Lamarque v. Centreville Savings Bank*, 22 A.3d 1136, 1140 (R.I. 2011) (citing *Cathay Cathay, Inc. v. Vindalu, LLC*, 962 A.2d 740, 745 (R.I.2009)).

## IV

## Discussion

## A

## Easement by Prescription

■ "To establish an easement by prescription, a claimant must show 'actual, open, notorious, hostile, and continuous

use under a claim of right for at least ten years.'" *Hilley*, 972 A.2d at 651–52 (quoting *Nardone v. Ritacco*, 936 A.2d 200, 205 (R.I.2007)); *see also* G.L.1956 § 34–7–1.[9] A claimant bears the burden of proving each of these elements "by clear and satisfactory evidence." *Hilley*, 972 A.2d at 652 (citing *Nardone*, 936 A.2d at 205); *see also Carpenter v. Hanslin*, 900 A.2d 1136, 1146 (R.I.2006) ("The burden is on the party claiming the easement to prove each element by a preponderance of clear and convincing evidence."). The determination of whether the claimant has sustained this burden is "an exercise of the [trial justice's] fact-finding power." *Nardone*, 936 A.2d at 205 (quoting *Stone v. Green Hill Civic Association, Inc.*, 786 A.2d 387, 389–90 (R.I.2001)); *see also Palisades Sales Corp. v. Walsh*, 459 A.2d 933, 936 (R.I. 1983).

■ We note that, generally, "[p]rescriptive rights are not favored in the law, * * * since they necessarily work corresponding losses or forfeitures on the rights of other persons[,]" 25 Am.Jur.2d *Easements and Licenses* § 39 at 536 (2004), a sentiment we recently accentuated in regard to the doctrine of adverse possession. *See Cahill v. Morrow*, 11 A.3d 82, 88 (R.I. 2011) ("it is not without an eyebrow raised at the ancient roots and arcane rationale of adverse possession that we apply the doctrine to * * * modern property dispute[s]"). Based on the similar elements of proof required to establish an adverse-possession claim, this Court oft considers its past pronouncements in such cases when examining a plaintiff's claim to a

9. General Laws 1956 § 34–7–1 provides in pertinent part:

"Where any person * * * shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever * * *."

prescriptive easement. However, "[u]nlike the establishment of title by adverse possession, exclusivity is not a necessary element for a valid claim to an easement by prescription." *Palisades Sales Corp.,* 459 A.2d at 937.

In this case, the trial justice determined that Drescher's activities in the right-of-way constituted "actual" use for the purposes of establishing a prescriptive easement. Based on Drescher and his workers' use of the right-of-way as a driveway to access various points of his property, we likewise conclude that his use was "actual" in nature. *See Anthony v. Searle,* 681 A.2d 892, 897 (R.I.1996) (recognizing that "actual" use of land is use similar to that which would ordinarily be made by owners of like land).

■ Despite Drescher's "actual" use of the disputed right-of-way, the evidence presented at trial decidedly supports the trial justice's determinations that Drescher's use was not open, notorious, hostile and under claim of right for a continuous period of ten years. Indeed, no particular act is essential to establish an intention to claim an easement by prescription. *See Carpenter,* 900 A.2d at 1147. "It is sufficient if one goes upon the land openly and uses it adversely to the true owner, the owner being chargeable with knowledge of what is done openly on his land." *Id.* (quoting *Reitsma v. Pascoag Reservoir & Dam, LLC,* 774 A.2d 826, 831 (R.I.2001)). Here, however, Drescher's documented use did not rise to the level of open or notorious use sufficient to put Johannessen's predecessors on notice of Drescher's alleged hostile claim. *See Tavares v. Beck,* 814 A.2d 346, 352 (R.I.2003). Although Drescher asserted at trial that the prior owners of lot 7 were aware of his use of the right-of-way to access lot 6, the trial justice placed great weight on what he viewed as the credible witness accounts of

Drescher's "infrequent use." Affording these factual findings and credibility determinations substantial deference, as we must, we conclude that Drescher did not establish by clear and satisfactory evidence that his intermittent use—which did not approach regularity until a few years prior to trial—was open and notorious in nature.

■ Furthermore, the record reveals that Drescher's use was neither hostile nor under claim of right as required to establish an interest attained by prescription in the right-of-way at issue. When "establishing hostility and possession under a claim of right, * * * the pertinent inquiry centers on the claimants' *objective manifestations* of adverse use rather than on the claimants' *knowledge* that they lacked colorable legal title." *Cahill,* 11 A.3d at 90 (quoting *Tavares,* 814 A.2d at 351). Thus, to constitute hostile use, the claimant need only show a use "inconsistent with the right of the owner, without permission asked or given, * * * such as would entitle the owner to a cause of action against the intruder [for trespass]." *Tavares,* 814 A.2d at 351 (quoting 16 *Powell on Real Property,* § 91.05[1] at 91–23 (2000)). Similarly, "a claim of right may be proven through evidence of open, visible acts or declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the record owner." *Id.* (citing *Picerne v. Sylvestre,* 122 R.I. 85, 91–92, 404 A.2d 476, 479–80 (1979)). Here, Drescher's use of the right-of-way was deemed by the trial justice to be "consistent with the known permitted use of neighbors." Finding that Drescher "was merely availing himself of a perceived invitation to occasionally traverse the [right-of-way,]" the trial justice cited to Mr. Gaspar's permissive use and maintenance of the right-of-way at the request of Dr. Petit, as well as

the permission informally granted to Mr. Walker by Johannessen's predecessor-in-interest to use the right-of-way to shuttle between lots 6 and 7 for his farming activities. The trial justice's detailed findings that Drescher's use of the right-of-way was permissive, and, that such use did not exceed the scope of this permission to effectively ripen into hostile use, are fully supported by the evidence in the record and shall not be disturbed. *Cf. Nardone,* 936 A.2d at 206–07 (holding that the trial justice's failure to make a factual finding concerning whether the plaintiffs granted claimants permission to use driveway was error and subjected the case for remand).

■ Moreover, contrary to Drescher's contention on appeal, it is our opinion that the trial justice did not err in considering in his analysis the permissive use of the right-of-way by Mr. Walker and other neighbors, nor did he err in determining that Dr. Petit's "permission" to Mr. Gaspar weakened any claim of hostile use. *See Burke–Tarr Co. v. Ferland Corp.,* 724 A.2d 1014, 1019 (R.I.1999) (recognizing that an inference of permissive use defeats the element of hostile use). Notwithstanding Dr. Petit's arguable lack of authority to allow Mr. Gaspar's use, Mr. Gaspar was under the distinct impression that he accessed and repaired the right-of-way permissively. Further, Mr. Gaspar on occasion accompanied Mr. Walker to lot 6 using the right-of-way. Drescher cannot contend that these actions were *"objective manifestations* of adverse use[,]" even if his workers had operated under illusionary permission. *Cahill,* 11 A.3d at 90 (quoting *Tavares,* 814 A.2d at 351). A claimant is "required to show some affirmative act constituting notice to [the true owner] that their occupancy was hostile to the owner and they were claiming the property as their own." *Picerne,* 122 R.I. at 92, 404 A.2d at 480 (citing *Martineau v.*

*King,* 120 R.I. 265, 269, 386 A.2d 1117, 1119 (1978)); *see also Altieri v. Dolan,* 423 A.2d 482, 484 (R.I.1980) (affirming trial court's finding of no easement when "driveway was used on a friendly and neighborly basis and not adversely"). Such is not the case here.

■ Also significant is Drescher's submission in 2006, through his daughter, of proposed subdivision plans depicting a new road on lot 6 situated parallel to the right-of-way, which plans received preliminary approval. None of the submitted plans indicated access to lot 6 via the right-of-way at issue. Albeit abandoned, these proposed plans are certainly "objective manifestations" by Drescher recognizing Johannessen and his predecessors' preeminent title to the right-of-way. *Cahill,* 11 A.3d at 93. Such "objective manifestations that another has superior title, made after the statutory period and not made to settle an ongoing dispute, are poignantly relevant to the ultimate determination of claim of right and hostile possession during the statutory period." *Id.* (citing *Harp v. Christian,* 215 Ark. 833, 223 S.W.2d 778, 779 (1949)).

■ Lastly, we find no error in the trial justice's determination that Drescher's alleged use of the property did not satisfy the statutory ten-year prescriptive period. Though mindful that constant "[y]ear-round occupation is not required to prove actual and continuous possession[,]" this Court does not view the continuity of Drescher's "possession [as] sufficient to signal the true owner of the land that a claim of title contrary to his own [was] being asserted." *Lee v. Raymond,* 456 A.2d 1179, 1183 (R.I.1983) (citing *Sherman v. Goloskie,* 95 R.I. 457, 465, 188 A.2d 79, 83 (1963)). Drescher conceded that his visits to lot 6 were "consistent[,]" yet "random," sometimes with weeks passing in between such outings. Mr. Gaspar re-

counted using the right-of-way to access the property for clearing and maintenance work from 1993 until 1999 or 2000. Assuming *arguendo* that Mr. Gaspar's use of the right-of-way was not permissive, this time frame falls short of the requisite ten-year period. Significantly, several witnesses corroboratively testified that heavy clearing and construction activities were not consistently noticeable on lot 6 until a few years before trial. We conclude, as did the trial justice, that Drescher has failed to establish by clear and convincing evidence continuous use of the right-of-way for the statutory period. Accordingly, we affirm the judgment of the Superior Court declaring that Drescher holds no prescriptive rights in the right-of-way.

### B

### Public Road

 On appeal, Drescher also contends that the trial justice erred in determining that the right-of-way was not a dedicated public road. As recognized by this Court, "the dedication of land to the public is 'an exceptional and unusual method by which a landowner passes to another an interest in his [or her] property.'" *Newport Realty, Inc. v. Lynch,* 878 A.2d 1021, 1032 (R.I.2005) (quoting *Robidoux v. Pelletier,* 120 R.I. 425, 433, 391 A.2d 1150, 1154 (1978)). "[E]xistence of an intent to dedicate will not be lightly presumed. Evidence must be shown which reasonably tends to demonstrate such an intent." *Volpe v. Marina Parks, Inc.,* 101 R.I. 80, 86, 220 A.2d 525, 529 (1966) (citing *Vallone v. City of Cranston Department of Public Works,* 97 R.I. 248, 254, 197 A.2d 310, 314 (1964)).

 In regard to roadways, "when a property owner subdivides land and sells lots with reference to a plat, the purchasers of those lots are granted easements in the roadways shown on the subdivision plan, whether or not those roads subsequently are dedicated to the public." *Hilley,* 972 A.2d at 651 (citing *Lynch,* 878 A.2d at 1032). Generally, "the easement depicted on the plat 'is appurtenant to the property and passes with the conveyance of the property * * *.'" *Bitting v. Gray,* 897 A.2d 25, 32 (R.I.2006) (quoting *Lynch,* 878 A.2d at 1033).

 Whether these roadways are open to the public, however, hinges "on the owner's intent at *the time the plat is recorded and the lots are sold.*" *Lynch,* 878 A.2d at 1033 (citing *Robidoux,* 120 R.I. at 434, 391 A.2d at 1155) (emphasis in original). "[T]he recordation of a plat with streets delineated thereon and lots sold with reference to the plat" serves as an indication of the owner's intent to offer such streets to the public. *Id.* (quoting *Robidoux,* 120 R.I. at 434, 391 A.2d at 1155); *see also Donnelly v. Cowsill,* 716 A.2d 742, 748 (R.I.1998) ("in most instances the filing and the acceptance of a plat plan are sufficient evidence of a landowner's intent to dedicate land for road purposes, particularly in situations in which lots are subsequently sold with reference to the recorded plat"). Recognized as the doctrine of incipient dedication in our jurisprudence, this "time-honored method [has long been used] for platting streets and roads and conveying lots with reference to the plat." *Lynch,* 878 A.2d at 1033 (citing *Robidoux,* 120 R.I. at 433, 391 A.2d at 1154); *see also Town of Barrington v. Williams,* 972 A.2d 603, 611 (R.I.2009) ("When a plat is recorded with streets and lots, and lots are sold with reference to the plat, there has been an incipient dedication of the streets and roadways").

 Nevertheless, this Court's inquiry is not predicated solely upon ascertaining of an owner's intent to dedicate—it is necessary to prove acceptance of the road by

the public in order to establish its dedication. *See Lynch,* 878 A.2d at 1034–35 ("[I]n determining whether a street or roadway has been offered to the public, a finding of incipient dedication is the first step, and if so, was there acceptance by the public?"). Such proof must be "clear and convincing," *Vallone,* 97 R.I. at 254, 197 A.2d at 314, and demonstrate one of two methods—"acceptance of the [road] by official action or [by] public user." *Lynch,* 878 A.2d at 1033 (citing *Robidoux,* 120 R.I. at 433, 391 A.2d at 1154).

Here, Drescher maintains that both the 1986 and 2004 subdivision plans filed and recorded in regard to lot 7 unambiguously evidence the owner's dedicatory intent. The trial justice, in his decision, implicitly noted otherwise when he stated that "the original [subdivision] proposal is unclear on the intended status of the [right-of-way] * * *." Our review yields the same conclusion—that the subdivision plans submitted into evidence do not unambiguously disclose the owner's manifest intent to dedicate the right-of-way. Although in some instances, "a recorded plat is all that is needed to disclose a landowner's dedicatory intent[,] * * * [v]ery often lines and figures drawn on a land-development plat may be unclear as to their intended purpose." *Robidoux,* 120 R.I. at 434, 391 A.2d at 1155. Here, the plat submitted in connection with the 1986 subdivision designates the right-of-way as "AREA OF PROPOSED ROAD," while the 2004 subdivision plat indicates the same as "EXISTING 40′ R.O.W[.]" The 1986 plat delineates the right-of-way using both solid and dashed lines; however, at trial, Mr. Amarantes testified that he used solid lines when the right-of-way bordered a property line.[10] Thus, as the trial justice found, the

subdivision plans are "unclear" in regard to the intended purpose of the right-of-way.

In light of this ambiguity, we look to the facts of this case to determine whether the owner of lot 7 made an offer to dedicate the right-of-way to the public. *See Robidoux,* 120 R.I. at 433, 391 A.2d at 1154. Bestowing the requisite deference to the trial justice's findings of fact, we hold that neither Mr. Hough, nor his mother, intended in either 1986 or 2004 to dedicate the right-of-way to the public. As noted by the trial justice, attorney Eddy testified that he did not represent to the local planning board that the right-of-way was to be dedicated in 1986. Although Ms. Cabot believed that the 1986 subdivision plans depicted a dedicated public road, the trial justice determined that her belief was insufficient to sustain a finding of public dedication. Likewise indicative of a lack of dedicatory intent is the fact that subsequent to the subdivision of lot 7 in 1986, the purchaser of lot 7–2 was expressly granted an easement over the right-of-way. Had the right-of-way been incipiently dedicated to the public, that express easement simply would be superfluous. *See Volpe,* 101 R.I. at 86, 220 A.2d at 529 ("No part of a plat or map can be considered as superfluous or meaningless."). Furthermore, although not relied upon by the trial justice in his reasoning, Mr. Hough testified that he harbored no intent to dedicate the road as public during the 2004 subdivision.

Even if this Court were to concede that the right-of-way was intended to be a dedicated public road, the evidence presented at trial failed to show its acceptance as such by the public. In fact, the trial justice thoroughly reviewed the pertinent wit-

---

**10.** We note that the trial justice made no factual findings or credibility determinations in regard to Mr. Amarantes's testimony.

ness testimony in coming to his well-reasoned determination that public acceptance of the right-of-way never materialized. On appeal, Drescher takes issue with the trial justice's consideration of common-law highway-dedication principles as an analytical backbone for determining whether acceptance of the right-of-way had been effectuated by the public user. *See Eddy v. Clarke*, 38 R.I. 371, 379, 95 A. 851, 854 (1915) (" '[T]o create a public way by use the proof must show that the use has been general, uninterrupted, continuous[,] and adverse so as to warrant the inference that it had been laid out, appropriated, or dedicated by the proprietors of the adjoining land to the public.' "). However, this Court very recently cited to this holding in *Town of Barrington*, 972 A.2d at 611–12. Thus, the trial justice's consideration of these factors—generality, interruption, continuity, and adversity—was not error in our opinion. His thorough recount of the neighborly, and often permissive, periodic use by local residents, such as attorney Eddy, Mr. Walker, Mr. Montgomery, Mr. Humphrey, and Ms. Cabot, fully supports his conclusion that the right-of-way was not used as a public road as contemplated by our case law. Accordingly, we affirm the trial justice's declaration about the status of the right-of-way as non-public.

## V

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record may be remanded to the Superior Court.

Justice ROBINSON did not participate.