GOLDBERG, J.,
with whom SUTTELL, C.J., joins, dissenting.
Because I believe that there was sufficient evidence to show the plaintiffs’ hostile use of the disputed area, and that no evidence was presented to support the trial justice’s finding of implied permission to defeat such hostile use in this case, I respectfully dissent.
The discord in this case finds its genesis in the fact that on August 8, 1985, Albert Romanella conveyed a large commercial building that encroaches upon — and which has a loading dock that cannot be accessed without traversing upon — JR & Sons’s property. To gain access to this loading dock, JR & Sons granted plaintiffs an express easement, recorded in the Town of Westerly’s land evidence records, which “permit[s] ingress and egress to and from the loading dock at the southwest corner of [Butterfly Realty’s] building[.]” This easement, however, expressly prohibits deliveries over the delineated route by “semitrailers.”
The testimony and evidence presented at trial established that, beginning in 1985 until the time of trial, Butterfly Realty’s building was leased to a succession of businesses, all of which used the loading dock for deliveries to their respective businesses. Each tenant received deliveries at the loading dock at varying frequencies from delivery trucks, including tractor— trailer trucks. In order to access the loading dock, these delivery trucks — including semitrailers-would drive over JR & Sons’s lot, outside the boundaries of the express easement. Thus, the evidence presented at trial clearly establishes that plaintiffs’ use of lot No. 330 to reach the loading dock was adverse to the restrictions set forth in the recorded easement — and any understanding between the parties — ab in-itio.
Nevertheless, the trial justice concluded that the use of lot No. 330 to access the loading dock was actual, open, and notori *1036 ous, but not sufficiently hostile to establish an easement by prescription. The trial justice explained that “Romanella’s assent, accompanied with various restrictions, controlled the use of the area. * * * Being neighborly while actively controlling the use of one’s property should not be construed as establishment of the hostility necessary to suffer the loss of a property right.” He concluded that “Butterfly’s use of the trucking routes, although exceeding the scope of the express easement, was not 'hostile’ because Romanella implicitly permitted the use to continue.” I am of the opinion that, in so finding, the trial justice clearly erred in that he overlooked and misconceived evidence on the controlling issues and law in this case. There simply is no evidence to support the finding that defendant employed “various restrictions” or “controlled the use of the area.”
In Butterfly Realty v. James Romanella & Sons, Inc., 45 A.3d 584 (R.I.2012) (hereinafter, Butterfly I), this Court explained that, “to show sufficient hostility, a claimant must, by clear and convincing evidence, demonstrate objective trespassory acts that are adverse to the rights of the true owner, not acts that are inconsistent to the use of the true owner.” Id. at 590 (citing Reitsma v. Pascoag Reservoir & Dam, LLC, 774 A.2d 826, 832 (R.I.2001)). However, “[i]t is sufficient if one goes upon the land openly and uses it adversely to the true owner, the owner being chargeable with knowledge of what is done openly on his land.” Id. at 589 (quoting Reitsma, 774 A.2d at 831). “Thus, to constitute hostile use, the claimant need only show a use ‘inconsistent with the right of the owner, without permission asked or given, * * * such as would entitle the owner to a cause of action against the intruder [for trespass].’ ” Drescher v. Johannessen, 45 A.3d 1218, 1228 (R.I.2012) (quoting Tavares v. Beck, 814 A.2d 346, 351 (R.I. 2003)).
This Court has previously been confronted with whether a landowner’s use was permissive, thus defeating the element of hostility and a plaintiffs claim for possession. In Altieri v. Dolan, 423 A.2d 482, 484 (R.I.1980) — on which the trial justice relied — this Court held that a prescriptive easement was not established where a shared driveway between neighbors “was used on a friendly and neighborly basis and not adversely.” In reaching this conclusion, however, this Court specified that the plaintiffs failed to make the requisite showing of “some affirmative act constituting notice to [defendant] that their occupancy was hostile to the owner and they were claiming the property as their own.” Id. (quoting Picerne v. Sylvestre, 122 R.I. 85, 92, 404 A.2d 476, 480 (1979)).
Again, in Burke-Tarr Co. v. Ferland Corp., 724 A.2d 1014, 1019 (R.I.1999), this Court determined that “an inference of permissive use, which would defeat the element of hostile use” could not be drawn solely from a landowner’s knowledge that a water line was being installed under a right of way that the landowner had leased to the defendant. In Burke-Tarr, not only did the landowner fail to object to the installation of the water line or to its continued use, but the landowner also testified that she did not know that the installed water line significantly exceeded the area specified in the leased right of way. Id. at 1020. As a result, this Court held that, in the absence of an objection, a landowner’s mere awareness of how his or her land is used is insufficient to establish express or implied permission which could negate hostile use. Id. at 1019-20.
Finally, in Reitsma, 774 A.2d at 832, this Court further explained that “[w]hen confronted with * * * an open, unsolicited, and long-continued use of the property, the true owner must affirmatively com *1037 municate either objection or permission to stop the statutory prescriptive period from running.” (emphasis in original.) This Court specified that “[m]ere acquiescence or silence, however, in the face of uses that are inconsistent with the true owner’s property rights, does not constitute permission.” Id. In Reitsma, this Court concluded that “no inference of permission from [the defendant] could be drawn from the mere fact that [the defendant] allowed the use to continue.” Id.
In this case, the trial justice noted that he was “not convinced that the owners or the employees of the parties knew the exact location of the easement at the time that Butterfly was using the disputed area.” Indeed, neither Charles Sposato nor James Romanella, the current owners of JR & Sons, was aware that there even was an easement. Nonetheless, the evidence presented at trial established that tractor-trailer trucks regularly made deliveries to the loading dock via the brown route and the green route, in violation of the terms of the express easement for over twenty years, which is well in excess of the statutory period necessary to establish a prescriptive easement. The evidence also established that the current owners of JR & Sons had no idea that there was an express easement, along with its prohibition against semi-trailer trucks that was filed in the land evidence records. The record also shows that no express permission was given to plaintiffs to traverse lot No. 330 using the green and brown routes, nor was there ever an objection raised by defendant to this use.
Charles Sposato and James Romanella testified that each owned twenty-five percent of JR & Sons when Albert Romanella conveyed the property — and JR & Sons granted the easement — to Butterfly Realty in 1985. Their testimony indicates that they were uninformed and ignorant of the details of this transaction. Sposato testified that since that time, it was always his belief that Butterfly Realty should pay JR & Sons for its use of lot No. 330, and claims to have expressed this belief to Albert Romanella. Sposato did not disclose how Albert Romanella responded to this request. Sposato testified that after Albert Romanella died in 2004, he considered asking for rental payments, but never approached anyone from Butterfly Realty. Nonetheless, he testified at trial that, consistently for the past twenty-five years, he unequivocally believed that Butterfly Realty should be paying rent to JR & Sons for its use of lot No. 330:
“Q: But your testimony is that for twenty-five years you thought they should have been paying rent; correct?
“A: No question about it.
“Q: And your attitude about it never changed in that twenty-five years? You always thought they should be paying money?
“A: No question about it.
“Q: It took you until 2010 to ask for it?
“A: Because I had leverage then.
“Q: You had leverage six years ago when A1 Romanella died; didn’t you?
“A: We discussed it. We didn’t do it.”
This testimony is not that of a friendly neighbor.
In his deposition, Sposato claimed that an oral agreement existed between Albert Romanella and Mat Serra — who owned the liquor store on Butterfly Realty’s property prior to 1985 — that allowed trucks to drive onto lot No. 330 to access the loading dock. However, when asked when this purported oral agreement was reached between Ro-manella and Serra, Sposato testified:
“I never had a date. I never knew of a date that it was reached. It was just *1038 something that [James] and I had gotten from Albert that he had given to them people. * * * We never had any [sic] we didn’t know where the lines were. We knew that they were on our property. * * * [B]ut I, I never knew Albert talked to them. He never told anybody. So, if he talked to them, I don’t know when that was.” (Emphasis added.)
This comment led to the following exchange:
“Q: So, from 1985 through the time that you called [the surveyor]— “A: Yes.
“Q: —to locate the property line—
“A: Yup, I didn’t know.
“Q: —you were operating under an understanding that there was some kind of oral agreement?
“A: That’s how we addressed it. We never bothered anybody.” (Emphasis added.)
At trial, however, when asked whether he knew of any agreement in place that permitted delivery trucks to traverse lot No. 330 to access the loading dock, Sposato flatly replied, “Not at all.” Although the majority claims that this nebulous testimony establishes that Sposato “apparently believed” that Albert Romanella had already granted plaintiffs permission to traverse lot No. 330, our case law is clear that a landowner’s subjective belief is insufficient to establish permissive use. See Reitsma, 774 A.2d at 832. And, in this case, Sposato was wrong. Our law therefore requires, when confronted with Butterfly Realty’s “open, unsolicited, and long-continued use of the property,” that JR & Sons “affirmatively communicate either objection or permission to stop the statutory prescriptive period from running.” Id.
The evidence, however, clearly establishes that defendant did neither. According to Shawn Martin, neither Albert Romanella nor Sposato ever voiced an objection to the delivery trucks’ use of lot No. 330 to access the loading dock. Indeed, there was no communication between these neighbors on this issue for twenty-five years. Martin’s wife, Rita Martin — who managed the liquor store from the time it opened in 1985 until its closing in 1989 — testified that although she personally observed tractor-trailer trucks making deliveries to the loading dock, she had never received any written or oral communications from anyone affiliated with JR & Sons about the delivery trucks’ use of lot No. 330 to access the loading dock. Paul Williams, who worked in the auto parts store for fifteen years— from 1991 until 2006 — explained that the auto parts store received weekly deliveries at the loading dock from semi-trailer trucks that were approximately fifty feet in length. Williams also testified that he never had a conversation with anyone affiliated with JR & Sons concerning the trucks’ deliveries to the loading dock. Finally, Craig Jackson, the owner of Auto Audio, testified that he also observed semi-trailer trucks at the loading dock on a weekly basis to make deliveries to the auto parts store. He maintained, however, that the only time he could recall deliveries being interrupted was when defendant installed the concrete pylons in 2010.
In addition, Sposato testified that, for more than twenty-five years, he personally observed tractor-trailer trucks traverse lot No. 330 to reach the loading dock on a weekly basis. He also testified that he never voiced an objection to plaintiffs’ use of lot No. 330, nor did he make any attempt to stop delivery trucks from using the lot to reach the loading dock. Curiously, in the event his building was damaged by a delivery truck, Sposato claimed he would speak directly with the driver, and not with Butterfly Realty or its ten *1039 ants. Thus, the record in this case clearly shows that defendant never raised an objection to plaintiffs’ use of the disputed area as is required by our law. See Reits-ma, 774 A.2d at 832.
Moreover, the evidence in this case also does not support the majority’s conclusion that JR & Sons impliedly gave plaintiffs permission to use the disputed area, or that defendant’s actions rose above the “inactive status of quiescence or unqualified submission” that is insufficient to support an inference of permission. Reitsma, 774 A.2d at 832-33 (“Mere failure to protest is not permission but acquiescence. * * * Acquiescence is the inactive status of quiescence or unqualified submission to the hostile claim of another, and is not to be confused with permission, which denotes a grant of permission in fact or a license.”) (quoting Garrett v. Gray, 258 Md. 363, 266 A.2d 21, 27-28 (1970) (internal quotation marks and emphasis omitted)). In support of its holding that Charles Sposato and James Romanella “took affirmative steps consistent with an inference of permission,” the majority first points to the fact that Sposato would move his car for delivery trucks traversing lot No. 330. However, the record reflects that this action was not necessarily taken for the purpose of allowing access to plaintiffs’ loading dock. Rather, Sposato indicated that, although he would move his car so that traffic on lot No. 330 would not become congested, he could not identify whether the truck accessing the lot at the time was making a delivery to the Butterfly Realty building or to one of his own tenants. In fact, Sposato stated that vehicles — including tractor trailers — made deliveries to his own ten tenants on lot No. 330 by following the brown route. Likewise, when asked on cross-examination about the damage to his property — which he claimed was caused by deliveries made by tractor-trailer trucks to the Butterfly Realty building — Sposato admitted that vehicles making deliveries to his own tenants could have been responsible for the damage:
“Q: I believe your testimony was to the effect that trailer trucks making deliveries to the [Butterfly Building] caused the concrete apron to break up; is that correct?
“A: We believe the trucks going through there caused the concrete ramp to break as you can see. We believe the trucks did that.”
“Q: Well, which trucks?
“A: All I said was trucks did that. I don’t know which truck did it.
“Q: Well, was it trucks servicing [Butterfly Realty] or was it trucks servicing your tenants that caused that?
“A: I couldn’t tell you. I really don’t know which truck. I said trucks did that not the cars.
“Q: But — so it could have been your own tenants’ deliveries that caused that problem?
“A: Yes.
“Q: And you also testified, did you not, that trucks had hit your building?
“A: Yes.
[[Image here]]
“Q: Was that — could that also have been any truck that did so?
“A: Could that also have been any truck? Of course.”
The majority also points to conversations that James Romanella purportedly had to support its holding that defendant “took affirmative steps consistent with an inference of permission.” I believe, however, that the majority’s reliance on these conversations is misplaced, and similarly overlooks and misconstrues the material evidence presented in this case. For in *1040 stance, the majority recounts that James testified in his deposition that, after instances in which his building was damaged by a delivery truck, he had two separate conversations with Paul Martin — first in 2001 and again in 2004 — in which he claims that Martin apologized and promised “that he would make sure it didn’t happen again.” However, Paul Martin’s testimony at trial reveals that, from 1985 to 2003, he had no involvement in Butterfly Realty. In fact, Martin’s testimony reveals that he only acquired an interest in — and became involved in — Butterfly Realty in 2010. Furthermore, events that occurred in 2001 — sixteen years after Butterfly Realty acquired the property — and in 2004 — nineteen years later — are well beyond the statutory time period necessary to establish prescriptive use, and therefore have no bearing on whether the use was permissive. See G.L.1956 § 34-7-1.
Nonetheless, the majority points to yet another purported conversation that James Romanella recounted at trial, in which he claims to have received a call from one of Butterfly Realty’s tenants regarding whether delivery trucks could navigate lot No. 330 with the Christmas tree sales in place. This conversation occurred sometime during a twenty-year period:
“Q: Now, at any time did you ever have any conversations with anyone affiliated from Auto Zone regarding the Christmas tree operation that you just described?
“A: Yes.
“Q: When did this occur?
“A: I’m not sure what year but obviously it was prior to 2005. * * * [I]t would [have been] between 1985 and 2005.
“Q: Okay. Do you know if it was in the 1990s, in the 2000s?
“A: I’m not sure.”
Despite his inability to recall at what point in the twenty-year span this brief conversation occurred, Romanella detailed how he told the manager from Auto Zone “that it was my parking lot and that stand had been there year after year and it would continue as long as my tenant wanted to do it.” In addition to relying on this nebulous testimony, the majority fails to recognize that this testimony at trial stands in stark contrast to James Romanella’s deposition testimony — which was introduced into evidence at trial — in which he declared that, aside from the two aforementioned conversations with Paul Martin, he never had any other conversations with Martin or any affiliates, tenants, or co-owners of Butterfly Realty — including Auto Zone and Auto Audio — until the concrete pylons were installed. Thus, the record does not support the trial justice’s conclusion — and the majority’s affirmation — that defendant’s “assent, accompanied with various restrictions, controlled the use of the area.”
Finally, the majority concludes that Spo-sato’s neighborly ways are what led him to never address anyone affiliated with Butterfly Realty or its tenants to voice an objection or stop the encroachment. Although the majority claims that Sposato “consciously refrained” from asking plaintiffs for compensation, the evidence presented at trial once again tells a different story. Sposato testified that it was always his belief that plaintiffs should pay for its use of JR & Sons’s property, but that he never asked for rent from Butterfly Realty until approximately six months before trial, when he telephoned Paul Martin and demanded that Butterfly Realty pay $900 per month for its tenants’ use of lot No. 330:
“Q: And your testimony here today is that you were voicing objections about Butterfly Realty and their tenants using your property to *1041 make deliveries and parking their cars twenty-five years ago?
“A: Did I? Are you asking me did I say that?
“Q: Yes.
“A: Yes, I did.
“Q: Okay. But the first time you ever addressed this issue with Butterfly was approximately six months ago; correct?
“A: That’s what was prompted by what I told you because we thought they were using our property to park on, using our property to turn around on, coming up to the — and I said to my partner [James], and we both discussed it, if they are going to use that property they should pay us a rental and that brought my call to Paul Martin which I did.”
In his deposition testimony, Sposato testified that, prior to this demand for rent money, he was unaware that there was an express easement from JR & Sons to Butterfly Realty, and was surprised to learn of the existence of the easement and of its terms. However, as soon as he learned about it, he made a hefty demand for $900 per month. When Butterfly Realty refused, JR & Sons installed concrete pylons along the express easement, making it impossible for any delivery vehicle to access the loading dock. When asked at trial why he installed the pylons, Sposato’s response was about money: “I was trying to get together with Paul Martin and come to some kind of agreement for them using all of our property all the time, that’s why I installed them so I’d obstruct the flow.” This testimony mirrored Sposato’s deposition testimony, in which he declared why he had the surveyor place an outline along the easement boundary: “Because we wanted compensation for using our property.”
These uncontroverted facts chronicle that Sposato — as an owner of JR & Sons— was not trying to be neighborly; rather, he always wanted to be compensated for the use of lot No. 330. Nonetheless, he was ignorant of the dimensions of his own land and did nothing. The plaintiffs used the area in a manner adverse to his ownership rights for over twenty-five years.[1] Our case law is clear that JR & Sons’s failure to effectively communicate permission or objection to stop the prescriptive clock from ticking is fatal to a finding of permissive use. See Reitsma, 774 A.2d at 832 (“When confronted with * * * an open, unsolicited, and long-continued use of the property, the true owner must affirmatively communicate either objection or permission to stop the statutory prescriptive period from running.”); see also Restatement (Third) Servitudes § 2.17 cmt. c. at 265-66 (2000) (as acknowledged in the majority’s opinion, “[l]andowners are required either to formalize permissive arrangements, or to prevent use by others to avoid the risk that rights will be established by prescription”).[2] The evidence in this case *1042 clearly shows that defendant did neither. Thus, absent permission or objection to plaintiffs’ use, our case law is equally clear that defendant’s mere awareness that tractor-trailer trucks traversed lot No. 330 to access the loading dock is insufficient to establish implied permission to negate plaintiffs’ hostile use. See Burke-Tarr, 724 A.2d at 1020 (landowner’s testimony that she was unaware that the installed water line significantly exceeded the area specified in the leased right of way, coupled with her failure to object to the installation of a water line or to its continued use, was insufficient to show permissive use). The record in this case is clear that JR & Sons did nothing to stop plaintiffs’ adverse use until it was too late.
Moreover, I do not believe that this case presents the Court with an expansion of an express easement as the majority contends. It is undisputed that an express easement existed, permitting plaintiffs to access the loading dock from lot No. 330. However, it is also undisputed that the actual routes used by the delivery trucks— the green route and the brown route — did not follow, and occurred well outside of, the boundaries of the express easement, and operated in direct contravention of its specific prohibition against semi-trailers. I would therefore contrast this case from this Court’s holding in Hilley v. Lawrence, 972 A.2d 643 (R.I.2009), in which this Court stated that “[wjhen permission is granted for a particular use, a later use of the same kind cannot be characterized as adverse.” Id. at 652 (citing Stone v. Green Hill Civic Association, Inc., 786 A.2d 387, 390 (R.I.2001) (emphasis added)). As a threshold matter, the use of lot No. 330 by tractor-trailer trucks was without permission, in violation of the recorded easement, and was adverse to the landowner. See Drescher, 45 A.3d at 1228 (“[T]o constitute hostile use, the claimant need only show a use ‘inconsistent with the right of the owner, without permission asked or given, * * * such as would entitle the owner to a cause of action against the intruder [for trespass].’ ”)(quoting Tavares, 814 A.2d at 351). . Moreover, despite the recorded easement’s express prohibition against semi-trailers, evidence presented at trial clearly established that these types of trucks frequented the loading dock for decades without objection by defendant. See Reitsma, 774 A.2d at 832 (“Mere acquiescence or silence * * * in the face of uses that are inconsistent with the true owner’s property rights, does not constitute permission.”). Moreover, I discern no evidentiary support for the trial justice’s conclusion — and the majority’s affirmation — that although the green and brown routes were used in full view of defendant, it “was done so with [its] permission.” See id. (“When confronted with * * * an open, unsolicited, and long-continued use of the property, the true owner must affirmatively communicate either objection or permission to stop the statutory prescriptive period from running.”). As such, I believe the plaintiffs have met their burden of showing that their use of lot No. 330 was hostile.
Accordingly, I am of the opinion that the trial justice erred in finding that there was implied permission for semi-trailer trucks to access the loading dock by traversing *1043 over lot No. 330 outside of the perimeters of the express easement. I am further unpersuaded that defendant’s mere knowledge that trucks were traversing the lot created an implied permission sufficient to defeat plaintiffs’ hostile use. See Burke-Tarr, 724 A.2d at 1019 (a landowner’s knowledge of how his or her land is used, without a grant of permission or objection, is insufficient to establish express or implied permission).
Finally, although I acknowledge the majority’s declared intention to charter “a consistent path by showing solicitude for the rights of record owners,” I believe it should do so on the basis of the evidence in the record. Simply put, this case centers on a record wholly barren of evidence to support the majority’s conclusion.
Continuous Use
Because I would hold that Butterfly Realty’s use of the claimed area was hostile, it is also necessary to address the parties’ arguments concerning continuous use before determining whether plaintiffs were in fact entitled to a prescriptive easement. See Butterfly I, 45 A.3d at 588 (“One who claims an easement by prescription bears the burden of establishing ‘actual, open, notorious, hostile, and continuous use under a claim of right for at least ten years.’ ”) (quoting Hilley, 972 A.2d at 651— 52). In his decision, the trial justice determined that Butterfly Realty had “failed to establish continued use for a period of ten years,” finding that the yearly Christmas tree sales had interrupted the continuous use of the disputed area. On appeal, plaintiffs argue that the trial justice erred in finding that the Christmas tree sales interrupted plaintiffs’ continuous use of the area. I agree.
According to Rita Martin, for one month each year, during the Christmas season, tenants of JR & Sons would sell Christmas trees alongside the northern side of the laundromat. She described the area occupied by the trees as extending a “little beyond” the painted parking spaces located on the northern side of the laundromat. At trial, Mrs. Martin sketched the approximate area of the tree sales on a scaled map; according to her drawing, the trees did not overlap any part of the brown route. She explained, however, that the actual dimensions of the area occupied by the trees would vary slightly from one year to another. Nonetheless, she recounted that the tree sales never hindered deliveries to the loading dock.
Paul Williams also testified about his observations of the annual Christmas tree sales. He stated that the tree sales took place every Christmas season that he worked at the auto parts store, and ran from the end of November through December. Like Mrs. Martin, Williams sketched the location of the tree sales on a scaled map; this drawing depicted the trees encroaching upon the brown route, but not blocking the route entirely. Williams stated that he had personally observed trucks making deliveries while the trees were in place, but the trucks would have to “move[ ] over a little” to avoid the trees. According to Williams, the space in between the trees and the Butterfly Realty building was “a little tight,” but that a semi-trailer truck could access the loading dock. In fact, Williams insisted that the trees did not prevent the delivery trucks from entering from East Avenue and reaching the loading dock.
As did Mrs. Martin and Williams, Craig Jackson, the owner of Auto Audio, also drew the area occupied by the Christmas trees on a scaled diagram. Jackson’s sketch indicated that the trees did not encroach upon any portion of the brown route, and, depicted the “average” size of the Christmas tree display, because it var *1044 ied from year to year. Jackson testified that, despite the Christmas tree display, the weekly deliveries to his store were never interrupted until defendant installed the pylons along the southwestern boundary of the easement.
Sposato testified that the Christmas tree sales took place on the northern side of the laundromat almost every year from 1985 to 2006, and lasted for approximately one month from Thanksgiving through Christmas Eve. When presented with Williams’s drawing, Sposato indicated that the drawing was a “good illustration” of the area occupied by the Christmas trees. When asked about the trucks’ ability to use the brown route while the trees were in place, Sposato stated, “[t]here’s no room for anybody to really get through there in my opinion.” He clarified, however, that he was “not saying that [the delivery trucks] didn’t at times go through there because obviously they did, but not conveniently.” Significantly, there was no testimony from James Romanella that the annual Christmas tree sales blocked access to the loading dock or that trucks were unable to pass over the brown route.
Our case law has recognized that one of the methods by which a record owner can interrupt a claimant’s continuous use of a disputed area is by “physical ouster of the claimant or a ‘substantial interruption’ of the claimant’s possession by the record owner.” Carnevale v. Dupee, 783 A.2d 404, 409-10 (R.I.2001) (quoting LaFreniere v. Sprague, 108 R.I. 43, 52, 271 A.2d 819, 824 (1970) (emphasis added)). This Court previously has found that a landowner’s casual or passive attempts to interrupt a claimant’s continuous use were not sufficiently substantial so as to amount to an interruption of continuous use. See, e.g., Camevale, 783 A.2d at 411 (the mere act of making a claimant aware of surveyed boundaries is insufficient to substantially interrupt the claimant’s physical possession of the property); Jerry Brown Farm Association, Inc. v. Kenyon, 119 R.I. 43, 48, 375 A.2d 964, 966-67 (1977) (the placement of “a saw horse with a sign reading ‘Road Closed’ at the entrance to the road once a year,” when “the saw horse only covered a small portion of the road” and “[vjehicles desiring access would simply go around the sign,” did not constitute substantial interruption); LaFreniere, 108 R.I. at 52, 271 A.2d at 824 (holding that performing a survey and giving notice to claimants of the proper boundary line did not constitute a sufficiently substantial interruption to halt the continuous use of the area, when claimants removed surveyor’s stakes and continued to use the area in a similar manner); see also 25 Am.Jur.2d Easements and Licenses § 62 at 559 (2004) (“Ineffective interruptions, such as the erection of barricades and gates that are ignored or destroyed, will not prevent a use from ripening into [a prescriptive] easement.”). Accordingly, a landowner’s actions to break a claimant’s continuous use of a disputed area “must be such as to actually interfere with and interrupt substantially the claimant’s use of the land.”[3] LaFreniere, 108 R.I. at 53, 271 A.2d at 824.
In Butterfly I, 45 A.3d at 591, this Court determined that the factual findings of the trial justice were inconsistent with his conclusion that the annual Christmas tree sales interrupted Butterfly Realty’s continuous use of the prescriptive area, and re *1045 manded the case with instructions to further examine the evidence and decide this issue. In the trial justice’s second decision, he once again determined that the plaintiffs’ “use of the green and brown routes was not continuous for the statutory period of ten years,” based on similar findings that, because of the Christmas tree sales, tractor trailers “sometimes had more difficulty” accessing the loading dock area, although “[sjmaller trucks and consumer vehicles were still usually able to make it through this narrowed passage.” However, there was no testimony or evidence presented at trial that the annual Christmas tree sales blocked access to the loading dock by delivery trucks sufficient to constitute an ouster. At best, the evidence suggested that the placement of the tree display merely made it inconvenient for trucks to access the loading dock. Inconvenience that does not rise to the level of physical ouster or substantial interruption as required by our case law is of no moment on the question of continuous use. Accordingly, it is my opinion that the trial justice erred when he found that the presence of the annual Christmas tree sales interrupted Butterfly Realty’s continuous use of the green route and the brown route.
Lastly, the plaintiffs argue that its tenants’ use of the claimed prescriptive area may be imputed to Butterfly Realty. However, after concluding that the plaintiffs failed to prove their claim for a prescriptive easement, the trial justice did not address on remand whether the various tenants’ use of lot No. 380 could be imputed to Butterfly Realty. Because the trial justice did not reach the issue of imputed use, it is therefore unnecessary to address it.
Conclusion
Based on the foregoing, I am satisfied that the plaintiffs have established, by clear and satisfactory evidence, that their use of lot No. 330 was “actual, open, notorious, hostile, and continuous use under a claim of right for at least ten years.” Butterfly I, 45 A.3d at 588 (quoting Hilley, 972 A.2d at 651-52).
*1046 [[Image here]]

. Curiously, although Sposato testified that he personally constructed the building that houses his office on lot No. 330, he claims to have never noticed the express easement on any engineering drawing used in this construction.

. The majority cites § 2.17 of the Restatement (Third) Servitudes (2000) for the assertion that a recognized danger of prescriptive easements is their tendency to discourage "neighborly conduct and accommodation.” However, I believe that this language must be read in full context:
"Prescription has both positive and negative effects. It encourages owners to prevent unauthorized users from developing reliance interests in continued use of their land, and it protects the reliance interests of those whose uses have continued without interruption for the prescriptive period. On *1042 the negative side, it discourages neighborly conduct and accommodation. Landowners are required either to formalize permissive arrangements, or to prevent use by others to avoid the risk that rights will be established by prescription. Prescription tends to increase the costs of land ownership by creating a need for periodic monitoring to detect adverse uses. On the positive side, prescription increases the security of arrangements based on long-continued uses and tends to increase the value of land served by the use.” Id. at 265-66 (emphases added).

. It is important to note that continuous and uninterrupted use by a claimant does not require constant use of the disputed area; “[i]t is necessary that it be continuous only in the sense that the claimant exercised a claim of right without interference at such times as it was reasonable to make a proper use of the land.” LaFreniere v. Sprague, 108 R.I. 43, 53, 271 A.2d 819, 824 (1970).