**Fred M. HAZARD et al.**

v.

**EAST HILLS, INC.**

**No. 2011–316–Appeal.**

Supreme Court of Rhode Island.

July 6, 2012.

Laurel Y. Hazard, Pro Se.

Carol L. Ricker, Esq., Warwick, for Defendant.

Present: SUTTELL, C.J., .
GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case takes us to the picturesque Matunuck Hills section of the Town of South Kingstown. The plaintiff, Laurel Y. Hazard (plaintiff or Laurel Hazard),[1] appeals from the grant of a motion for summary judgment in favor of the defendant, East Hills, Inc. (defendant or East Hills),[2]

---

1. The original complaint listed four plaintiffs, all members of the Hazard family; however, only one plaintiff was listed on the notice of appeal and only one filing fee was paid. At a hearing on June 24, 2011, the trial justice determined that Laurel Y. Hazard was the only remaining appellant. A judgment entered on July 8, 2011, indicating that Laurel Y. Hazard was the only plaintiff who timely filed an appeal.

2. The defendant, East Hills, Inc., is a nonprofit corporation chartered for the purpose of holding 26.5 acres of land situated at 2717P Commander Oliver Hazard Perry Highway in South Kingstown, Rhode Island (Subject Lot)—for the benefit of the descendants of Reverend George R. Hazard and Frances M. Hazard.

declaring that the plaintiff is barred by the doctrine of laches from prosecuting a claim of ownership to an undeveloped eight-acre tract of land (8–Acre Parcel or disputed parcel) in South Kingstown, Rhode Island and finding that the defendant had established ownership of the tract of land by adverse possession and in accordance with the Rhode Island Marketable Record Title Act, G.L.1956 chapter 13.1 of title 34. On appeal, the plaintiff, who is *pro se*, asserts that her claim should not be barred by the doctrine of laches, that the defendant failed to satisfy the requisite elements of adverse possession of the subject property, and that a 1909 boundary agreement entered into by the defendant's predecessor in interest was defective and was improperly relied upon by the special master as a title transaction for purposes of establishing marketable record title.

This case came before the Supreme Court for oral argument on May 9, 2012, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After reviewing the record and considering the written submissions of the parties, we conclude that cause has not been shown and that this appeal may be decided without further briefing or argument.[3] For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

### Facts and Travel

The property at the heart of this dispute is composed of approximately 26.5 acres of land (Subject Lot), situated at 2717P Commander Oliver Hazard Perry Highway in South Kingstown, Rhode Island, and is described as Lot 28 on Tax Assessor's Plat 74. A portion of Lot 28, allegedly consisting of the undeveloped 8–Acre Parcel, is in contention in this case; and it is that 8–Acre Parcel to which plaintiff claims to have rightful title. The storied and intricate history of this portion of Lot 28 has brought the parties to this Court.

In 1895, Violet Hazard (Violet), plaintiff's great-great-great grandmother and the widow of Alexander P. Hazard, conveyed two parcels of land to Reverend George R. Hazard (Rev. Hazard) of Newport, Rhode Island, by warranty deed. The land, conveyed in a single instrument, consisted of a fifteen-acre parcel (15–Acre Parcel) and a 7.5–acre parcel (7.5–Acre Parcel).[4] The defendant asserts record ownership of substantially all the land in that conveyance, currently described as Lot 28.[5] According to plaintiff, the disputed 8–Acre Parcel is situated within Lot 28; however, unlike the evidence of the devolution of the 15–Acre Parcel and the 7.5–Acre Parcel, there is no evidence in the record before us of any concrete devolution of the 8–Acre Parcel that brings the title to the present day.

By order entered on June 8, 2010, the trial justice appointed attorney Charles S. Soloveitzik to serve as special master (Mr. Soloveitzik or special master). Mr. Soloveitzik, in an eloquent and comprehensive report (master's report), provided the trial

---

**3.** The plaintiff did not appear for oral argument, despite written notice from the Supreme Court clerk. Accordingly, with the assent of counsel for defendant, we shall decide this case on the basis of the memoranda submitted by the parties.

**4.** Notably, the 7.5–Acre Parcel was described as bounded "southerly in part by [land of] Dr. George Hazard, deceased."

**5.** The record discloses that in 1956, "a 2 acre parcel of 'marsh' (which was concluded to be within the boundaries of the [Rev.] Hazard parcel depicted on the 1909 and 1915 surveys) was conveyed to Edmund W. Kitteredge, thereby reducing the size of and reconfiguring the northerly and easterly boundaries of the parcel."

justice with a complete title analysis for the devolution of both the 15–Acre Parcel and the 7.5–Acre Parcel, from a point of common ownership in 1862, to the time of his report. However, he was unable to do so with respect to the disputed parcel.

In 1809, the 8–Acre Parcel was acquired by Dr. George Hazard (Dr. Hazard), who plaintiff alleges was her great-great-great-great grandfather and who died intestate in 1829.[6] It is plaintiff's contention in this case that an interest in the disputed parcel passed to her ancestor, Alexander P. Hazard, by intestate succession after Dr. Hazard's death, and therefore her family holds title to the disputed parcel. The plaintiff also alleges that the 1895 conveyance of the 15–Acre Parcel and the 7.5–Acre Parcel by Violet was invalid, based on Violet's lack of capacity,[7] thus defeating any claim defendant has to Lot 28, including the disputed parcel.

In 1909, a boundary agreement (boundary agreement) was created and recorded by Rev. Hazard and William F. Price (who owned the abutting land), setting forth the boundaries of what is now Lot 28. The plaintiff contends that the boundary agreement improperly subsumed the 8–Acre Parcel into one of the lots previously conveyed by Violet and that the boundary agreement was defective.

On August 20, 2007, plaintiff filed a declaratory judgment action in Superior Court, requesting that the court declare:

(1) the rights and interests of the parties with respect to the Subject Lot; (2) that plaintiff is the true owner of all or part of the Subject Lot; (3) that the 1895 deed was null and void; and (4) that the boundary agreement was inaccurate and erroneously included the 8–Acre Parcel, which belongs to plaintiff. The plaintiff argued that Rev. Hazard did not own that portion of the Subject Lot containing the 8–Acre Parcel and, therefore, could not convey that land to his successors in interest, including defendant. The defendant filed an answer on September 6, 2007, asserting several affirmative defenses, including that plaintiff's claim was barred by laches. The defendant also filed a two-count counterclaim. The first count sought to quiet title to Lot 28 and additionally asserted adverse possession, asking the court to adjudge defendant the owner in fee simple of the entire Subject Lot, including the 8–Acre Parcel. The second count asserted that plaintiff acted in bad faith, and also sought money damages.

On December 9, 2009, defendant moved for summary judgment, contending that, from the time that Rev. Hazard purchased the property in 1895, he and his successors in interest "have been in actual, continuous, open, notorious, hostile [possession of the property,] under claim of right[, with] exclusive use and possession," and thus held title to the property through adverse possession. The defendant argued that since the Subject Lot was purchased over

---

**6.** Doctor George Hazard (Dr. Hazard) and Reverend George R. Hazard (Rev. Hazard) are two different individuals: Dr. Hazard, the putative father of Alexander P. Hazard (plaintiff's great-great-great grandfather and Violet's husband), acquired plaintiff's 8–Acre Parcel in 1809 and died intestate in 1829; Rev. Hazard, defendant's predecessor in interest, died in 1934. The plaintiff alleges that Alexander P. Hazard's father was Dr. Hazard, and that Alexander P. Hazard was born out-of-wedlock; however, no documentation other

than "family lore" and affidavits submitted by plaintiff's family support such a contention.

**7.** The plaintiff bases this claim on an 1880 census that listed Violet as insane, in addition to having dropsy. According to plaintiff, Violet's mental incapacity would have prohibited her from executing a valid deed of conveyance, thereby rendering all subsequent transfers by defendant's predecessors in interest void.

a century ago, defendant and its predecessors in interest had constructed and maintained permanent physical structures on the property, had installed water and septic systems, and had openly and continuously renovated and refurbished the structures. The defendant again raised the affirmative defense of laches in its motion for summary judgment, contending that plaintiff had unreasonably and negligently delayed her claim to the disputed parcel for over 100 years, to defendant's prejudice.

The plaintiff filed a memorandum in opposition to summary judgment on April 13, 2010, asserting that there existed genuine issues of material fact sufficient to preclude summary judgment. The plaintiff argued that defendant failed to prove the elements of adverse possession with respect to the easterly portion of Lot 28— the section in contention—as well as the area where plaintiff claimed her family burial ground was located, which partially overlapped the 8–Acre Parcel.[8] The plaintiff also argued that the affirmative defense of laches must fail because defendant failed to demonstrate any prejudicial reliance on plaintiff's failure to assert their claim. The defendant responded with a supplemental memorandum that set forth the prejudice defendant allegedly suffered as a result of plaintiff's over-a-century-long delay in bringing suit. The defendant recounted the various substantial improvements that it had made on the property and argued that defendant could have "invested in another piece of land for the benefit of the [Rev.] George R. Hazard family had the [p]laintiff[ ] come forward in a reasonable time and claimed title to

the Subject [Lot]." The defendant further argued that it suffered prejudice as a result of plaintiff's failure to bring the claim earlier because "[i]nvaluable evidence that could support the [d]efendant's claim to title in the property has been lost."

As noted, the trial justice appointed Mr. Soloveitzik as special master and directed him to address the following question:

"WHAT IS THE CHAIN OF TITLE OF THE PARCELS THAT NOW COMPRISE THE TRACT MORE PARTICULARLY DESCRIBE[D] AS LOT [28] ON TOWN OF SOUTH KINGSTOWN TAX ASSESSOR'S PLAT 74?"

The master's report was filed with the court on September 7, 2010, and contained extensive findings with respect to the devolution of title to the parcels in question, as well as nine exhibits and additional materials submitted by the parties, which enabled the special master "to understand their respective theories of title[.]" However, the parties' contentions notwithstanding, his analysis required "extensive additional index searches and record review to complete [the] charge in establishing fully supportable conclusions with respect to the relevant chains of title."

Mr. Soloveitzik's report established satisfactory chains of title to the 15–Acre Parcel and the 7.5–Acre Parcel that were conveyed by Violet to Rev. Hazard in 1895, but Mr. Soloveitzik was unable to set forth the devolution of Dr. Hazard's 8–Acre Parcel, which Dr. Hazard purchased in 1809. The special master indicated "that an exhaustive review of all materials supplied by the litigants and the materials uncovered

---

8. The plaintiff contended that "[a]s regards the easterly stretches of the property there has been no more sign of human occupancy, possession or control over the last century than of the vast stretches of conservation area and forest * * * that extends beyond it. There

have been no fences or improvements. No gardening or farming. Not even any 'no trespassing' signs. * * * [N]o occupancy or possession such as would place others on notice that defendant was acting as if it owned the easterly stretches of the tract."

in the supervised independent research conducted [by the special master and his title examiner] could not demonstrate how Dr. Hazard's 8–acre woodlot [nor a separate and] adjacent 7–acre woodlot * * * have devolved to the present time."[9] He further noted, that "[o]wnership of both of those parcels appeared vital to our analysis, because they would have been reasonably located, (at least in part) between Rev[.] George Hazard's easterly line and William F. Price's westerly line when the 1909 boundary line agreement was formed." He therefore concluded as follows:

"Unfortunately, in light of the vagaries of the 19th century descriptions, the lack of any courses, angles or distances contained in the descriptions of earliest described component parcels, the apparent combination of most relevant properties into common ownership to form differently described parcels, etc., we cannot complete the chains of those 2 relevant parcels from 1807 to the present as we did with the others."

The special master then turned to several pertinent sections of the Rhode Island Marketable Record Title Act, and he concluded that a liberal construction of the act "may allow us to find that the 1909 boundary line agreement was an 'instrument purporting to create . . . or transfer an interest claimed and relied upon by the parties' as basis for the marketability of title to the real estate affected" and that the boundary agreement could be "construed as a 'title transaction' or a 'transaction affecting title' and may fall within [the] scope of the [s]tatute."

The trial justice heard oral argument on December 3, 2010, with respect to defendant's motion for summary judgment. On February 23, 2011, the trial justice, in a comprehensive written decision, granted defendant's motion for summary judgment and concluded that plaintiff's claims were barred by laches and, additionally, that defendant held title to Lot 28 by adverse possession. The trial justice also determined that the "factual findings and conclusions of law of the [s]pecial [m]aster suggest that [d]efendant is entitled to summary judgment on the grounds that the Marketable Record Title Act recognizes the 1909 [b]oundary [a]greement as a title transaction sufficient to reflect title to the property in [d]efendant."

An order granting summary judgment entered on April 1, 2011, declaring that plaintiff's complaint was barred by laches and that defendant established ownership of Lot 28 by adverse possession. The order granting summary judgment also confirmed and adopted the findings and conclusions of the master's report that the

9. The special master noted that Dr. George Hazard died intestate on September 29, 1829, and that he had been married three times. His first wife, Sarah, died in 1803, followed by Mary, in 1806, and his third wife, Jane, survived him. After Jane received the requisite one-third portion of his estate "for life in dower," the remainder was recorded in the probate records. However, none of the properties listed in the appraisal described the 8–Acre Parcel acquired by Dr. Hazard in 1809, unless, as the special master observed, "that woodlot was then included with others to form a larger tract * * *." The special master also noted that "in addition to his widow, Dr. Hazard was survived by several children;" however, Alexander P. Hazard, plaintiff's great-great-great grandfather was not listed among them. According to plaintiff, Alexander P. Hazard was the illegitimate son of Dr. Hazard. This reported circumstance caused the trial justice to proceed to address the question of plaintiff's standing to bring this action because, under the 1829 laws of intestate succession, a child born out-of-wedlock was not capable of inheriting from his natural father. The trial justice remarked that defendant did not seek judgment in its favor on this ground. Based on our conclusion that plaintiff's claim is barred by the doctrine of laches, we decline to address this issue.

boundary agreement was a title transaction sufficient to quiet title in favor of defendant.

The appellate travel of this case, although not as complex as the history of the woodlot in contention, was not without difficulty. On May 31, 2011, defendant filed a motion to dismiss plaintiff's appeal, alleging that plaintiff failed to order transcripts and failed to transmit the record to this Court as required by Article I, Rules 10(b)(1) and 11(a) of the Supreme Court Rules of Appellate Procedure.[10] A hearing on the motion to dismiss was held in Superior Court on June 24, 2011—the transcript of that hearing is the only transcript in this matter that has been provided to this Court. The trial justice denied, without prejudice, the motion to dismiss the appeal, but ordered plaintiff to order any transcripts within thirty days from the date of the hearing. The trial justice also clarified that Laurel Hazard was the only plaintiff with standing at this juncture, and the order, which entered on July 8, 2011, reflected Laurel Hazard's status as the sole plaintiff to have timely filed an appeal in this case.[11]

### Issues on Appeal

On appeal, plaintiff contends that she and her family did not delay in bringing this claim such that her claim is barred by

10. The plaintiff filed a notice of appeal on March 31, 2011, which listed Fred M. Hazard as the plaintiff and "Laurel Hazard pro se" as the filing attorney, with Laurel Hazard's signature appearing on the notice. The notice of appeal did not indicate whether transcripts would be ordered, nor did it refer to an estimated cost or a court reporter's name.

11. The defendant filed a second motion to dismiss the appeal on July 25, 2011, based on plaintiff's failure to transmit the record to this Court after being ordered to do so. The defendant's motion to dismiss appears to have been denied, and the record reflects that an order for transcripts was submitted on July 26, 2011, by Frederick Hazard, but that it was

the doctrine of laches, that defendant did not satisfy the requirements necessary to prove adverse possession of the subject property, and that the boundary agreement entered into by defendant's predecessor in interest is defective and was improperly relied upon by the special master as a title transaction for purposes of establishing marketable record title.

### Standard of Review

 "In reviewing the Superior Court's judgment on a motion for summary judgment, we examine the matter *de novo* and apply the same standards as those used by the trial court." *Tavares ex rel. Guiterrez v. Barbour*, 790 A.2d 1110, 1112 (R.I.2002) (citing *Delta Airlines, Inc. v. Neary*, 785 A.2d 1123, 1126 (R.I.2001)). "We review the evidence in a light most favorable to the nonmoving party and will affirm the judgment if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Lynch v. Spirit Rent–A–Car, Inc.*, 965 A.2d 417, 424 (R.I.2009) (citing *Cullen v. Lincoln Town Council*, 960 A.2d 246, 248 (R.I.2008)).

### Analysis

### The Special Master's Report

Rule 53(c) of the Superior Court Rules of Civil Procedure provides for the ap-

only for the June 24, 2011 hearing transcript. The defendant next submitted a motion to dismiss in this Court, arguing that plaintiff had "repeatedly and categorically ignored the Rhode Island Rules of Appellate Procedure," resulting in substantial prejudice to defendant. This motion was granted on November 21, 2011, with the proviso that the appeal would "be automatically reinstated" if plaintiff filed its Rule 12A statement on or before December 16, 2011, inclusive of a certification indicating that plaintiff forwarded a copy of the 12A statement to defendant. The plaintiff filed a Rule 12A statement on December 7, 2011, thus breathing life back into the appeal.

pointment and duties of special masters, including that the master shall "do all acts and take all measures necessary or proper for the efficient performance of the master's duties * * *." Additionally, Rule 53(e)(2) sets forth the following:

"In actions to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as prescribed in Rule 6(d). The court after hearing may adopt it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

In this case, the special master was asked to report on the chain of title of the several parcels of land comprising Lot 28. The special master complied with this charge and issued his detailed, fifteen-page report, complete with relevant exhibits. Although there was some initial contention, both parties agreed with the special master's findings of fact, and we shall proceed with this opinion enlightened by his findings. We pause to recognize Mr. Soloveitzik's efforts as the special master; the master's report reflected a painstaking review of historical records and materials—it was both thorough and detailed, particularly in light of the lack of clarity presented by the issues at hand. We are satisfied that the trial justice did not err in confirming the master's report, nor is there a suggestion in the record that the special master's conclusions were clearly erroneous.

### Laches

■ The plaintiff contends that her claim is not barred by the doctrine of laches; plaintiff argues that "[a]ny assertion that our family merely, 'sat on [our] legal rights' and did nothing is simply untrue." According to plaintiff, the prosecution of this action was delayed because the family was unable to obtain legal representation. In her memorandum to this Court, plaintiff, recounting her family's rich oral tradition, avers that in 1911, her great-grandmother, Catherine Hazard (Catherine), went to the old house on the woodlot to check on the property and the family graveyard, when she was approached by a man "who claimed to be the owner of the property." The plaintiff averred that the man "proceeded to show [Catherine] a deed and told her that Violet lost [the property] to taxes and [Catherine] and our family could not come back there anymore." The plaintiff alleged that Catherine learned at the town hall that this was not the case, but was informed that "it had been too long, ten years had passed, and there was nothing she could do about it." The plaintiff declared that "[d]espite many attempts by Catherine, her son, Herbert E. Hazard, and [plaintiff's] [f]ather [Frederick M. Hazard, Sr.] over all the past years, they just could not get legal representation, as they were always told it had been too long." After our careful review of the record before us, including the memoranda of the parties, the master's report, the decision of the trial justice, and relevant case law, we conclude that plaintiff's claim is barred by the equitable doctrine of laches.

■ "Laches is an equitable defense that precludes a lawsuit by a plaintiff who has negligently sat on his or her rights to the detriment of a defendant." *O'Reilly v. Town of Glocester*, 621 A.2d 697, 702 (R.I. 1993) (citing *Fitzgerald v. O'Connell*, 120 R.I. 240, 245, 386 A.2d 1384, 1387 (1978)). The defense of laches "involves not only delay but also a party's detrimental reli-

ance on the status quo." *Andrukiewicz v. Andrukiewicz,* 860 A.2d 235, 241 (R.I.2004) (quoting *Adam v. Adam,* 624 A.2d 1093, 1096 (R.I.1993)). Because it is equitable in nature, the applicability of the defense of laches in a given case generally rests within the sound discretion of the trial justice. *See id.* (citing *O'Reilly,* 621 A.2d at 703). In terms of legal significance, laches "is not mere delay, but delay that works a disadvantage to another." *Chase v. Chase,* 20 R.I. 202, 203–04, 37 A. 804, 805 (1897). In *Chase,* this Court, faced with a disputed deed of conveyance where the children of the devisees challenged the conveyance based on the long-dead grantor's competency, described the nature of the delay that defeats a claim:

> "So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities and other causes, but when a court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief." *Chase,* 20 R.I. at 204, 37 A. at 805.

Upon a finding that a party was negligent in bringing a claim and that there was injury to the other party as a result of the delay, such negligence may give rise to the denial of relief. *See id.* When confronted with a defense of laches, a trial justice must apply a two-part test: "First, there must be negligence on the part of the plaintiff that leads to a delay in the prosecution of the case. * * * Second, this delay must prejudice the defendant." *School Committee of Cranston v. Bergin–Andrews,* 984 A.2d 629, 644 (R.I.2009) (quoting *O'Reilly,* 621 A.2d at 702). This Court "will not reverse the trial justice's decision on what constitutes laches on appeal 'unless it is clearly wrong.'" *Id.,* (quoting *Arcand v. Haley,* 95 R.I. 357, 364, 187 A.2d 142, 146 (1963)).

In the case before us, most, if not all, of the potential harm enunciated by the Court in *Chase* has been suffered by defendant. Evidence has been lost, witnesses have died, and title to these parcels has changed hands many times in the approximately 183 years since the death of Dr. Hazard and during the roughly 112-year interregnum between Violet's conveyance to Rev. Hazard and the institution of this suit. We agree with the trial justice that plaintiff and her predecessors, although aware of this claim and mindful that a wrong may have been perpetrated against them, failed timely to prosecute the action, such that plaintiff is barred from doing so now.

In reaching her decision, the trial justice relied on two cases demonstrating *per se* unreasonable delays in bringing suit—a delay of nine years and a delay of 200 years were both declared *per se* unreasonable.[12] We need not address the issue of *per se* negligence as it relates to the doc-

---

12. The trial justice cited *Womack v. San Francisco Community College District,* 147 Cal. App.4th 854, 865, 54 Cal.Rptr.3d 558 (Cal.Ct. App.2007), which concluded that a teacher's claim was barred by laches because his nine-year delay in asserting his claim was *per se* unreasonable. Additionally, the trial justice referenced *French v. Weld,* 1995 WL 809563, at *2 (Mass.Super.Ct.1995), which held that the "[p]ursuit of a claim for payment over two hundred years after maturity of an obligation defeats sound fiscal planning and is *per se* unreasonable."

trine of laches because we are satisfied that defendant otherwise is entitled to the benefits of this equitable defense. We are hard-pressed to conceive of a clearer example of the proper application of laches than in the case before us, in which a party delays bringing a claim for more than a century.

Additionally, we observe that it was incumbent upon plaintiff to come forth with a fair explanation of the reason for the delay. *See Rodriques v. Santos*, 466 A.2d 306, 311 (R.I.1983) (declaring that "time lapse alone does not constitute laches," but that laches may be invoked when there is an unexplained and inexcusable delay that caused the other party prejudice). It is plaintiff's very reason for the delay—that everyone from whom the family sought advice informed them that too much time had passed—that gives rise to laches in this case. The record before this Court discloses no justifiable reason or excuse for plaintiff's protracted delay in bringing suit.

 We also are satisfied that defendant has suffered prejudice as a result of the delay in bringing this claim. "[T]here is no hard and fast rule for determining what constitutes sufficient prejudice to invoke the doctrine of laches * * *." *Fitzgerald*, 120 R.I. at 249, 386 A.2d at 1389. "What constitutes the essential prejudice must depend upon the circumstances of each particular case." *Pukas v. Pukas*, 104 R.I. 542, 547, 247 A.2d 427, 429 (1968) (citing *Arcand*, 95 R.I. at 364, 187 A.2d at 146). Laches bars a stale cause of action when an unexplained or unjustified delay in asserting the claim is "of such great length as to render it difficult or impossible for the court to ascertain the truth of the matters in controversy and do justice between the parties * * *." *Fitzgerald*, 120 R.I. at 246, 386 A.2d at 1387 (quoting *Lombardi v. Lombardi*, 90 R.I. 205, 210, 156 A.2d 911, 913

(1959)). We are of the opinion that such is the case before us. Simply put, a delay of this magnitude, without question, has unduly prejudiced defendant's ability to produce evidence and procure witnesses to rebut plaintiff's claims. The record suggests that defendant and its predecessors in interest expended significant funds over the years improving the land on the good-faith belief that they held title to the Subject Lot, including the disputed parcel. Indisputably, the evidence and witnesses to rebut plaintiff's claims no longer are available, thereby causing defendant to operate at a significant disadvantage with respect to any defense.

Accordingly, we discern no error in the trial justice's conclusion that defendant proved the requisite elements of laches as a matter of law—plaintiff negligently and unjustifiably waited over a century to assert her cause of action and defendant was prejudiced as a result. The plaintiff's claim, therefore, is barred by the doctrine of laches.

 Laches is a complete defense; if a party successfully prevails in asserting the defense, the claim is barred. Having reached this conclusion, we deem it unnecessary to address the merits of the trial justice's decision as it pertains to adverse possession or the applicability of the Marketable Record Title Act to this case. We reach this conclusion mindful that in prosecuting an adverse possession claim, the claimant bears a heavy burden of proof—clear and convincing evidence—in what is a fact-intensive inquiry. *See Gardner v. Baird*, 871 A.2d 949, 954 (R.I.2005) (vacating the grant of summary judgment in an action claiming a prescriptive easement and concluding that fact-finding generally is necessary in such cases). Accordingly, we are of the opinion that summary judgment generally may not be appropriate in a claim for adverse possession. In any

event, given our holding that this claim is barred by the doctrine of laches, we need not reach this issue. Likewise, we leave for another day the question of whether the Marketable Record Title Act lends itself to a liberal interpretation.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The papers in this case may be returned to the Superior Court.