*1025 OPINION
Justice INDEGLIA, for the Court.
In this appeal, we revisit an ongoing dispute between two commercial landowners over the existence of a prescriptive easement used by delivery trucks to access a loading dock. The plaintiffs, Butterfly Realty and Dairyland, Inc. (plaintiffs), appeal from a Superior Court judgment denying their claim for a prescriptive easement on the property of the defendant, James Romanella & Sons, Inc. (JR & Sons or defendant). This ease came before the Supreme Court on December 10, 2013, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the parties’ arguments and reviewing their written submissions, we are satisfied that cause has not been shown. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.
I
Facts and Travel
The facts of this case were previously discussed in this Court’s recent opinion, Butterfly Realty v. James Romanella & Sons, Inc., 45 A.3d 584 (R.I.2012) (hereinafter, Butterfly I). In that decision, we vacated a judgment in favor of defendant and remanded the matter to the Superior Court. Upon remand, the parties waived the presentation of additional evidence. Accordingly, the facts provided in this opinion come from the one and only trial conducted in this case. We briefly recount below those facts relevant to the instant appeal.
The property at the center of this dispute consists of three commercial lots located in the Town of Westerly where East Avenue meets Granite Street and which are identified on assessor’s plat No. 77 as lots Nos. 330, 331, and 332. JR & Sons owns the most southerly of the three parcels, lot No. 330, which has frontage on East Avenue. At all times relevant to this appeal, a commercial building containing a laundromat has occupied the northern portion of lot No. 330. Lot No. 331, which is owned by Dairyland, Inc., lies immediately to the north of lot No. 330 and has frontage on Granite Street. Lot No. 332 sits immediately to the north of lot No. 331 and also has frontage on Granite Street. On August 8, 1985, Albert Romanella, then-president of JR & Sons, conveyed lot No. 332 by warranty deed to Butterfly Realty (Butterfly). That same day, Albert Romanella also assigned his lease for lot No. 331 to Butterfly.
Butterfly owns a single commercial building that occupies most of lots Nos. 331 and 332.[1] The southwestern corner of the building houses a loading dock, the door to which faces southward towards JR & Sons’s lot. Because the building sits nearly on top of the boundary line between lots Nos. 331 and 330, delivery trucks cannot access the loading dock without entering onto JR & Sons’s property. Accordingly, on August 16, 1985, JR & Sons granted Butterfly an express easement, recorded in the Town of Westerly’s land evidence records, which “permit[s] ingress and egress to and from the loading dock at the southwest comer of [Butterfly’s] building[.]” The terms of the easement, however, expressly prohibit deliveries by “semitrailers.” The southern boundary of the easement runs roughly parallel to the side *1026 of Butterfly’s building and becomes wider as it moves from east to west.
From 1985 onward, Butterfly’s building housed a succession of businesses, all of which made some use of the loading dock. A liquor store operated out of the building from 1985 to 1989. After the liquor store vacated the premises, Butterfly leased a portion of the building to an auto parts store. From 1993 through 2010, another tenant of Butterfly’s, Auto Audio, also operated a business out of a different portion of the building. The various businesses received deliveries from trucks of different sizes and with differing frequencies. In general, however, the delivery trucks would drive over JR & Sons’s lot, beyond the bounds of the express easement, to access the loading dock.
In May 2010, JR & Sons hired an engineer to determine the precise location of the express easement’s southern boundary after a delivery truck damaged a building on JR & Sons’s lot. JR & Sons then ordered the installation of “concrete pylons” along the southwestern boundary of the express easement. With the pylons in place, it was nearly impossible for delivery vehicles to directly access the loading dock. On June 14, 2010, Butterfly[2] responded by filing a complaint in Washington County Superior Court, claiming a prescriptive easement over JR & Sons’s lot.[3] The defendant filed a counterclaim for a permanent injunction to compel Butterfly to comply with the terms of the express easement.
A two-day bench trial on the parties’ claims commenced on December 8, 2010. The testimony and exhibits presented at trial indicated that delivery trucks typically used one of two routes to access the loading dock. These two paths were referred to as the “brown route” and the “green route” at trial. See Appendix.[4] When following the brown route, a truck would enter lot No. 330 from a curb cut on East Avenue and then drive westward, in between the laundromat and the Butterfly building, before making a left turn behind the laundromat. The delivery truck would then back up to the loading dock. When using the green route, a delivery truck would enter lot No. 331 from a curb cut on Granite Street, then drive southwestward across several painted parking spaces,[5] and cross onto lot No. 330, where it would continue along the brown route to reach the loading dock. At trial, both parties presented several witnesses who testified about the delivery trucks’ use of JR & Sons’s lot. We summarize below the relevant testimony.[6]
Shawn Martin, a part-owner of Butterfly, testified on behalf of plaintiffs. He explained that his partner, an attorney, had negotiated the exact terms of the express easement in 1985 but stated that he “roughly” understood where the boundaries of the express easement were located. According to Mr. Martin, neither Al *1027 bert Romanella nor Albert Romanella’s partner, Charles Sposato, had ever voiced any objections about the delivery trucks’ use of lot No. 330 to access the loading dock.
The plaintiff also presented Mr. Martin’s wife, Rita Martin, who managed the liquor store from the time it opened in 1985 until the time it closed in 1989. During the many hours that she spent at the store, Mrs. Martin personally observed trucks make deliveries to the loading dock. She estimated that the liquor store received approximately twelve to fifteen deliveries per week. Mrs. Martin further estimated that the trucks’ use of the brown and green routes was either roughly equal or that the brown route received slightly more use than the green route. She indicated that she had never received any written or oral communications from anyone affiliated with JR & Sons about the delivery trucks’ use of lot No. 330 to access the loading dock. Mrs. Martin testified that she and her husband had a “friendly relationship” with Mr. Sposato.
Mrs. Martin explained that, for approximately one month each year, one or more tenants of JR & Sons would sell Christmas trees alongside the northern exterior wall of the laundromat. She testified that the actual dimensions of the area occupied by the trees would vary slightly from one year to another. Nonetheless, according to her recollection, the trees never impeded the trucks’ abilities to make deliveries.
Paul Williams also testified on plaintiffs’ behalf. Mr. Williams worked in the auto parts store from 1991, approximately two years after the store opened, until 2006.[7] He explained that the auto parts store usually received deliveries at the loading dock on a weekly basis. According to Mr. Williams, those deliveries arrived by semitrailer trucks which were approximately fifty feet in length. He also testified that sometimes a garbage truck would pick up trash from the loading dock or a United Postal Service (UPS) truck would deliver a large item to the loading dock. Mr. Williams estimated that the delivery trucks’ use of the brown and green routes was roughly equal, but he clarified that a truck driver’s ability to use the green route depended on whether cars were parked in the parking spaces located southeast of Butterfly’s building. See Appendix. Mr. Williams testified that the annual Christmas tree sales did not prevent the delivery trucks from entering through the curb cut on East Avenue and reaching the loading dock.
The plaintiffs’ final witness was Craig Jackson, the owner of Auto Audio. Mr. Jackson testified that he personally supervised about half of Auto Audio’s deliveries. According to Mr. Jackson, UPS trucks made deliveries to the loading dock about twice per day and used both the brown and green routes. Approximately once every two weeks, a garbage truck would use the loading dock to pick up both Auto Audio’s and the auto parts store’s trash. Consistent with Mr. Williams’s testimony, Mr. Jackson testified that he observed semi-trailer trucks accessing the loading dock on a weekly basis to make deliveries to the auto parts store. He confirmed that the average size of the area occupied by the Christmas trees varied from year to year but maintained that the only time he could recall deliveries being impeded is *1028 when the concrete pylons were installed in 2010.
Charles Sposato, a 50 percent owner of JR & Sons, testified for defendant. In a deposition submitted into evidence at trial, Mr. Sposato stated that he was unaware of the exact location of the express easement until May 2010 when the survey was completed. Mr. Sposato further indicated in his deposition that he had previously believed that Albert Romanella had an oral, rather than a written, agreement with Butterfly that delivery trucks were allowed to cross over JR & Sons’s property to reach the loading dock. Accordingly, he testified at trial that he was surprised in May 2010 when he saw for the first time the deed granting Butterfly an express easement. He insisted that, since 1985, he had consistently believed that Butterfly should pay for its use of JR & Sons’s lot. Approximately twenty-five years ago, he expressed this belief to Albert Romanella. After Albert Romanella passed away in 2004, Mr. Sposato considered requesting that Butterfly pay rent but ultimately did not approach anyone from Butterfly at that time. He did not demand rent from anyone at Butterfly until approximately six months before trial when he telephoned Paul Martin, Shawn Martin’s brother. According to Mr. Sposato’s recounting of the telephone conversation, he requested that Butterfly pay $900 per month for its tenants’ use of lot No. 330.
According to Mr. Sposato, delivery trucks had more than once caused damage to JR & Sons’s property. On those occasions, Mr. Sposato spoke directly with the drivers of the trucks, but he did not tell anyone from Butterfly, Dairyland, or the auto parts store that the delivery trucks could no longer use JR & Sons’s lot. When asked at trial why he never forbade the delivery trucks from entering upon JR & Sons’s property, Mr. Sposato explained, “I just wanted to be a good neighbor I guess. I just never did.”
Mr. Sposato also testified about his personal observations of the delivery trucks’ use of JR & Sons’s lot. He indicated that, since 1995, he has visited JR & Sons’s property on a daily basis, except for several weeks each year that he spends in Florida. During his time at the property, Mr. Sposato personally observed semi-trailer trucks making deliveries to the loading dock. According to Mr. Sposato, the trucks mostly used the brown route. He clarified, however, that there are “many different trucks that come [into] this property. They are not all trailer trucks. They don’t all use that brown [route] at all. * * * They come in our property * * * all ways that I have noticed.” Mr. Sposato recalled a dozen or more instances when he had moved his car to accommodate the delivery trucks. He explained that the truck drivers did not ask him to move his car, but he would voluntarily do so if he noticed that the trucks were holding up traffic. Mr. Sposato confirmed that the Christmas tree sales took place on the northern side of the laundromat almost every year from 1985 to 2006 and lasted from approximately Thanksgiving through December 23 or 24.
James Romanella also testified for defendant. James[8] served as vice president of JR & Sons until 2004, when he became president. He recalled a telephone conversation that he had with the manager of the auto parts store about the Christmas trees. According to James’s recounting of the conversation, the manager was eon- *1029 cerned that the size of the area occupied by the trees was making it difficult for the delivery trucks to reach the loading dock. In response, James suggested that the delivery drivers use smaller trucks. He also informed the manager that the tree sales “would continue as long as [his] tenant wanted to do it.” James had no recollection of when this conversation occurred other than that it had taken place sometime between 1985 and 2005.
The trial justice denied plaintiffs’ claim for a prescriptive easement in a written decision filed on March 18, 2011. The plaintiffs appealed to this Court. In an opinion issued on June 27, 2012, we concluded that the trial justice had committed an error of law because he “inappropriately required Butterfly’s tenants’ use of the disputed land to be inconsistent with JR & Sons’s use * * Butterfly I, 45 A.3d at 589. Accordingly, we vacated the trial justice’s decision and remanded the matter for further proceedings. Id. at 592. We additionally instructed that on remand the trial justice should address certain inconsistent findings he had made with regard to the Christmas trees’ impact on Butterfly’s continuous use of the prescriptive easement. Id. at 591. Finally, we directed the trial justice to determine whether the various tenants’ use of lot No. 330 could be imputed to Butterfly for the purposes of establishing a prescriptive easement. Id. at 591-92.
Upon remand and after the parties waived the presentation of additional evidence, the trial justice issued a second written decision on November 9, 2012 in which he again denied plaintiffs’ claim for a prescriptive easement. In his second decision, the trial justice found that the delivery trucks’ use of lot No. 330 was actual, open, and notorious. He concluded, however, that such use was not sufficiently hostile to establish an easement by prescription. According to the trial justice, JR & Sons had given permission for the delivery trucks to traverse its lot in order to access the Butterfly building’s loading dock. He also concluded that the Christmas tree sales had interrupted the continuous use of the disputed area. The trial justice did not address whether the various tenants’ use of lot No. 330 could be imputed to Butterfly.
Judgment entered on November 20, 2012. The plaintiffs timely appealed to this Court. Additional facts will be provided, as needed, to resolve the issues raised on appeal.
II
Standard of Review
We afford “much deference to the factual findings of a trial justice sitting without a jury in a civil case.” DiPippo v. Sperling, 63 A.3d 503, 507 (R.I.2013) (quoting McGarry v. Coletti, 33 A.3d 140, 144 (R.I.2011)). We will not disturb the trial justice’s factual findings “unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.” Greensleeves, Inc. v. Smiley, 68 A.3d 425, 433-34 (R.I.2013) (quoting Grady v. Narragansett Electric Co., 962 A.2d 34, 41 (R.I.2009)). “If the trial justice’s decision ‘reasonably indicates that [he or she] exercised [his or her] independent judgment in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or otherwise incorrect as a matter of law.’ ” Cahill v. Morrow, 11 A.3d 82, 86 (R.I.2011) (quoting Now Courier, LLC v. Better Carrier Corp., 965 A.2d 429, 434 (R.I.2009)). Furthermore, the trial justice may “draw inferences from the testimony of witnesses, and such inferences, if reasonable, are entitled on review to the *1030 same weight as other factual determinations.” Id. (quoting DeSimone Electric, Inc. v. CMG, Die., 901 A.2d 613, 621 (R.I.2006)). In contrast, “we review de novo the trial justice’s conclusions of law.” Greensleeves, 68 A.3d at 434 (citing State v. Gianquitti, 22 A.3d 1161, 1165 (R.I.2011)).
Ill
Discussion
A few years ago, this Court observed that the “ancient roots and arcane rationale” of prescriptive land rights have become increasingly difficult to “square[ ] with modern ideals in a sophisticated, congested, peaceful society.” Cahill, 11 A.3d at 88, 87 (quoting Finley v. Yuba County Water District, 99 Cal.App.3d 691, 160 Cal.Rptr. 423, 427 (1979)). Although claims for adverse possession and prescriptive servitudes have continuing vitality in this jurisdiction, our jurisprudence on prescriptive rights in recent years has charted a consistent path by showing solicitude for the rights of record owners, and, correspondingly, guarding against the potential for uncompensated loss by holding claimants to a high burden of proof. See Drescher v. Johannessen, 45 A.3d 1218, 1227 (R.I.2012); Cahill, 11 A.3d at 88; see also Pelletier v. Laureanno, 46 A.3d 28, 35-36 (R.I.2012) (rejecting claim for easement appurtenant). A claimant of an easement by prescription “must show actu al, open, notorious, hostile, and continuous use under a claim of right for at least ten years.” Drescher, 45 A.3d at 1227 (quoting Hilley v. Lawrence, 972 A.2d 643, 651-52 (R.I.2009)). A plaintiff claiming an easement is held to a higher standard of proof than a plaintiff in an ordinary civil case. Pelletier, 46 A.3d at 35. He or she bears the heavy burden of proving “each element by a preponderance of clear and convincing evidence.” Carpenter v. Hans-lin, 900 A.2d 1136, 1146 (R.I.2006); see also Hilley, 972 A.2d at 652 (each element for a prescriptive easement must be proven by “clear and satisfactory evidence”).
Any analysis of a claim for a prescriptive right must take for its point of origin the principle that such rights “are not favored in the law, * * * since they necessarily work corresponding losses or forfeitures on the rights of other persons[.]” Drescher, 45 A.3d at 1227 (quoting 25 Am.Jur.2d Easements and Licenses § 39 at 536 (2004)); Butterfly I, 45 A.3d at 592 n. 8 (stating same). “The burdens of prescription * * * fall onto the shoulders of the subservient estate.” William G. Ackerman & Shane T. Johnson, Outlaws of the Past: A Western Perspective on Prescription and Adverse Possession, 31 Land & Water L.Rev. 79, 92 (1996). Those burdens include the “infringement of a landowner’s rights, a decrease in value of the servient estate, * * * the generation of animosity between neighbors, a source of damages to land * * * and the creation of uncertainty for the landowner.” Cahill, 11 A.3d at 87-88 (quoting Acker-man, 31 Land & Water L.Rev. at 92).
These foundational principles are equally applicable when the holder of an express easement seeks to expand that easement by prescription. An attempt by the holder of an express easement to unilaterally “expand the physical size, purpose or use of the easement beyond the terms as contained in the original grant * * * unduly interferes with the reserved rights of the owner of the servient tenement.” 28A C.J.S. Easements § 231 at 449 (2008). In cases such as this one where the easement holder seeks to change not only the frequency or type of use, but also the dimensions of an express easement, the enlargement “ ‘does more than merely increase the burden upon the *1031 servient estate; it has the effect of enveloping additional land,’ ” — land which the owner has purposely reserved for him or herself. Northwest Pipeline Corp. v. Luna, 149 Idaho 772, 241 P.3d 945, 948 (2010). Here, Butterfly seeks to expand a limited express easement into an amorphous prescriptive easement that will envelop nearly the entirety of JR & Sons’s lot.[9]
An enlargement of an express easement by prescription must satisfy all the traditional requirements for acquiring a prescriptive right. See Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land, § 8:16 (2014).[10] In the instant case, the trial justice found that Butterfly had failed to prove by clear and convincing evidence that its use was hostile to the record owner or that it was continuous for the statutory period. Butterfly challenges both of these findings on appeal. Before turning our attention, however, to the merits of the trial justice’s analysis of the element of hostility, we briefly address plaintiffs threshold contention that the trial justice was prohibited upon remand from performing any analysis of the element of hostility.
A
Scope of Remand
According to Butterfly, the trial justice exceeded the scope of this Court’s remand by revisiting the element of hostility. Butterfly argues that this Court had “already ruled that the trial justice had applied an incorrect legal standard in determining whether Butterfly had proven hostility, and did not invite the trial justice to revisit this element of proof.” [11]
As we have explained, “lower courts * * * that receive our remand or *1032 ders may not exceed the scope of the remand or open up the proceeding to legal issues beyond the remand.” Pleasant Management LLC v. Carrasco, 960 A.2d 216, 223 (R.I.2008) (quoting Willis v. Wall, 941 A.2d 163, 166 (R.I.2008)). “When a case has been once decided by this [CJourt on appeal, and remanded to the [Superior Court], * * * [the Superior Court] * * * cannot * * * intermeddle with it, further than to settle so much as has been remanded.” Id. (quoting United States v. Thrasher, 483 F.3d 977, 981 (9th Cir.2007)).
We see no reason why our conclusion in Butterfly I that the trial justice made an error of law would prohibit the trial justice from revisiting the element of hostility. To the contrary, our previous opinion stated that the trial justice’s “misapplication of law sufficiently tainted the balance of [his] decision, including any factual determinations.” Butterfly I, 45 A.3d at 590. We therefore conclude that the trial justice was not only authorized but indeed was intended upon remand to apply the correct legal standard to the facts to make a second determination as to whether Butterfly had proven hostile use.
B
Hostility
In his second decision, the trial justice found that Butterfly could not meet its burden of proof on the element of hostility because its delivery trucks’ use of JR & Sons’s property was permissive. The claimant of an easement by prescription bears the burden of proving by clear and satisfactory evidence that his or her use was adverse to that of the record owner. To demonstrate hostile use, the claimant must show use “without permission asked or given * * * such as would entitle the owner to a cause of action against the intruder [for trespass].” Drescher, 45 A.3d at 1228 (quoting Tavares v. Beck, 814 A.2d 346, 351 (R.I.2003)). On the issue of permission, this Court long ago articulated the relevant rule as follows:
“It is the well settled rule that use by expressed or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription, since one of the elements essential to the acquisition of the easement, namely, user as of right, as distinguished from permissive use, is lacking.” Tefft v. Reynolds, 43 R.I. 538, 542-43, 113 A. 787, 789 (1921).
Since this pronouncement in Tefft, this Court has continuously acknowledged that express or implied permission defeats a claim for a prescriptive right. See Burke-Tarr Co. v. Ferland Corp., 724 A.2d 1014, 1019 (R.I.1999) (distinguishing landowner’s “express or implied permission,” which will defeat a claimed easement, from landowner’s mere awareness, which will not); cf. Reitsma v. Pascoag Reservoir & Dam, LLC, 774 A.2d 826, 834 (R.I.2001) (concluding that “permission, express or implied, was never given” for claimant’s use of landowner’s property).
For a landowner who wishes to be an accommodating neighbor without creating a permanent burden on his or her land, “[t]he easiest remedy * * * is to give [the adverse user] permission to continue the use * * *. This effectively eliminates the adverse individual’s claim immediately.” Ackerman, 31 Land & Water L.Rev. at 95. One of the most well-recognized dangers of prescriptive easements is their tendency to “discourage[ ] neighborly conduct and accommodation. Landowners are required either to formalize permissive arrangements, or to prevent use by others to avoid the risk that rights will be established by prescription.” Restatement (Third) Servi-tudes, § 2.17 cmt. c at 265-66 (2000). The more formal a reviewing court requires *1033 that permission to be, the greater the uncertainty for the landowner. See Acker-man, 31 Land & Water L.Rev. at 95.
While this Court has required something more than silent acquiescence to show that a use was permissive, see Burke-Tarr Co., 724 A.2d at 1019, a landowner need not formally or expressly grant a user permission since “[permission sufficient to preclude a claim for a prescriptive easement * * * may be inferred from surrounding circumstances.” 28A C.J.S. Easements § 45 at 245 (2008); see Burke-Tarr Co., 724 A.2d at 1019 (acknowledging that “an inference of permissive use * * * would defeat the element of hostile use”). For example, in Drescher, this Court concluded that a claimant’s use of a right-of-way was permissive, where the facts and circumstances supported an inference that the claimant’s use was pursuant to a “ ‘perceived invitation.’ ”[12] Drescher, 45 A.3d at 1228-29 (emphasis added); see also Daniels v. Blake, 81 R.I. 103, 109, 99 A.2d 7, 11 (1953) (“friendly relations between respondent and complainants while the latter were openly using the strip to pass to and from the shore * * * tends to establish their use originally as merely permissive”).
Even where the issue of permission is raised, the burden is never on the landowner to demonstrate that the use was permissive. See Altieri v. Dolan, 423 A.2d 482, 483 (R.I.1980). The burden at all times remains on the claimant to establish adverse use by strict proof. See id. “The determination of whether the claimant [of a prescriptive right] sustained this burden of proof involves an exercise by the trial justice of his factfinding power.” Jerry Brown Farm Association, Inc. v. Kenyon, 119 R.I. 43, 52, 375 A.2d 964, 968-69 (1977); see Hazard v. East Hills, Inc., 45 A.3d 1262, 1271 (R.I.2012) (claims for prescriptive rights are “fact-intensive inquiries]”). Accordingly, the deference that this Court affords the trial justice is at its zenith. Even if more than one inference may be drawn from the record, we are bound to uphold the trial justice’s inferences so long as they are reasonable. Jerry Brown Farm Association, Inc., 119 R.I. at 51, 375 A.2d at 968. We conclude that the record in this case supports the trial justice’s reasonable inference that Butterfly’s use of JR & Sons’s lot was permissive.
Viewing the record from the proper deferential perspective, the testimony demonstrated that Charles Sposato — unaware of the boundaries of the express easement — begrudgingly allowed Butterfly to use his property for nearly twenty-five years, due, at least in part, to his belief that Albert Romanella had given oral permission for Butterfly’s trucks to traverse JR & Sons’s lot. Mr. Sposato consciously refrained from requesting any compensation from Butterfly for those twenty-five years. Since Mr. Sposato apparently believed that Butterfly had already received an explicit oral grant of permission from Albert Romanella to use JR & Sons’s lot, he could not reasonably be expected to have given Butterfly another express or formal grant of permission. Nor does the law require him to have done so. JR & Sons’s behavior did, however, go beyond mere tolerance and awareness. Mr. Spo *1034 sato and James Romanella took affirmative steps consistent with an inference of permission. Mr. Sposato moved his car to allow the trucks access to the loading dock.[13] When the manager of the auto parts store called to complain about the Christmas trees, James Romanella did not prohibit the trucks from entering while the trees were in place but instead responded by insisting that the trucks’ use of the lot must remain subservient to his tenants’ use of the lot. When his building was struck in 2001 and again in 2004, James had two separate conversations with Paul Martin, in which Mr. Martin apologized and promised James on each occasion that it would not happen again. After these conversations, James continued to allow Butterfly’s trucks to use JR & Sons’s property for nearly another six years. Mr. Sposato explained that he never forbade the delivery trucks to enter JR & Sons’s lot because he was trying to be a good neighbor.
This series of interactions adequately supports the trial justice’s conclusion that JR & Sons “permitted the use to continue” by giving its “assent, accompanied with various restrictions, [to] control ] the use of the area.” Such actions go beyond the “inactive status of quiescence or unqualified submission” which we have previously found insufficient to support an inference of permission. Reitsma, 774 A.2d at 832-33 (quoting Garrett v. Gray, 258 Md. 363, 266 A.2d 21, 27-28 (1970)). The trial justice therefore correctly concluded that Butterfly had not met its burden of clearly and convincingly proving its claim for a prescriptive easement. “A prescriptive easement cannot be established if permission to use the property can be inferred where the relationship between the parties is one of neighborly cooperation and accommodation.” 28A C.J.S. Easements § 45 at 245. The element of “hostility” does not refer to the emotional temperature of the neighbors’ relationship. See Butterfly 1, 45 A.3d at 589. Thus, the fact that Mr. Sposato and James Romanella may have accommodated Butterfly’s trucks with less than enthusiasm and alacrity does not turn a permissive use into a hostile one.[14]
After their building was damaged one time too many, Mr. Sposato and James Romanella investigated the boundaries of the express easement in May 2010 and decided that they would no longer permit Butterfly’s uncompensated use of JR & Sons’s property beyond those boundaries. Accordingly, they asked for monthly rent and installed the pylons, which actions prompted Butterfly to file suit almost immediately. JR & Sons’s revocation of permission does not suffice to prove hostility. If it did, a landowner such as JR & Sons who has previously permitted someone to use his or her property would be placed in the untenable position of either allowing *1035 the use to continue indefinitely or revoking permission and suffering the imposition of a permanent burden on his or her property. Under our law, a landowner who has previously permitted a neighbor to use his or her land is entitled to withdraw that permission without forfeiting his or her property rights. See Hilley, 972 A.2d at 652 (where use of easement was permissive until such time as landowner withdrew permission, user who filed suit immediately after revocation of permission could not establish claim to a prescriptive easement). Accordingly, JR & Sons was free to end Butterfly’s use of its lot, and its previous cooperation does not work a forfeiture of its rights.
In sum, we are satisfied that, in his second decision, the trial justice gave an accurate recitation of the law on hostility and drew a reasonable inference that Butterfly’s delivery trucks’ use of JR & Sons’s lot was permissive. Since Butterfly cannot succeed on its claim for a prescriptive easement without satisfying all of the requisite elements, our agreement with the trial justice’s finding that Butterfly failed to meet its burden of proof on the element of hostility suffices for us to uphold his decision. We therefore need not address Butterfly’s argument that the trial justice erroneously concluded that the annual Christmas tree sales interrupted the delivery trucks’ continuous use of JR & Sons’s lot.
IY
Conclusion
For the foregoing reasons, we affirm the judgment of the Superior Court. The papers in this case may be remanded to that tribunal.

. Part of the southwest corner of the building actually encroaches upon JR & Sons's lot No. 330.

. A later amended complaint included Dairy-land, Inc. as a plaintiff.

. Butterfly and Dairyland also filed claims for an implied easement, an easement by necessity, an easement by implication, an easement by acquiescence, and adverse possession. The only claim before the Court in the instant appeal is plaintiffs' claim for a prescriptive easement.

. An engineering drawing, appended to this opinion, depicts the “brown” and "green” routes testified to at trial. The express easement appears on the drawing as a dotted line.

. Some of the parking spaces actually straddle the boundary line between lots Nos. 330 and 331.

. Three pretrial depositions were additionally admitted into evidence as full exhibits.

. The record is somewhat vague concerning delivery trucks’ use of lot No. 330 during the time period from 1989 to 1991. As we explained in our previous opinion, this ambiguity is not necessarily fatal to plaintiffs’ claim because the time from 1991 forward could satisfy the statutory ten-year period for a prescriptive easement. See Butterfly Realty v. James Romanella & Sons, Inc., 45 A.3d 584, 587 n. 2 (R.I.2012)

. To avoid confusion, we refer to James Ro-manella by his first name. In so doing, we intend no disrespect.

. Despite the designation of the "brown” and "green” routes, the witnesses' collective testimony at trial clearly indicated that trucks took all different paths to navigate around the maze of cars, Christmas trees, buildings, and other obstacles that from time to time littered this small parking lot. Accordingly, although Butterfly attempts to confine its claimed easement to the "brown” and “green” routes, the reality is that every time a large truck tries to navigate those pathways and finds a car or other obstacle in its way, it will stray from the designated routes and envelop even more of JR & Sons’s property. Granting such an easement would be difficult to square with "this Court’s obligation to create the least burdensome easement possible[.]” Reitsma v. Pascoag Reservoir & Dam, LLC, 774 A.2d 826, 839 (R.I.2001) (Goldberg, J., dissenting).

. It has been said that "[e]nlargement by prescription .of an express easement is rare” due to "a lack of the elements necessary to create it.” Turner v. Bouchard, 202 Md.App. 428, 32 A.3d 527, 534 (Md.Ct.Spec.App.2011) (quoting Annot. 110 A.L.R. 915, 916 (1937)). For example, in a case factually similar to the one presently before this Court, a commercial landowner had an express easement, dating back to 1910, over part of the neighboring defendant’s property to allow trucks to access a loading dock. Mensch v. Netty, 408 N.W.2d 383, 384 (Iowa 1987). Modern-sized trucks and semi-trailers, however, could not back up to the loading dock within the narrow bounds of the express easement and therefore began to encroach farther onto the defendant’s land. See id. at 384-85. After a truck damaged the defendant’s building, the defendant refused to permit the trucks to continue to use his land to reach the loading dock. See id. at 385. Consequently, the plaintiff sought to establish that he had acquired a prescriptive easement for the additional footage. See id. The Iowa Supreme Court held that the plaintiff could not meet his burden of proof on the element of hostility because "[t]he fact that truck drivers had used the additional space to enter the alley at most shows permissive use.” Id. at 387.

.Butterfly additionally suggests that the trial justice based his second decision on a legal theory that was never argued. The record belies this assertion because JR & Sons argued permission from the outset of this case. In his opening statement on the first day of trial, JR & Sons's counsel took the position that Butterfly’s use was permissive.

. In Drescher v. Johannessen, 45 A.3d 1218 (R.I.2012), we additionally concluded that the trial justice appropriately considered the fact that neighbors and individuals other than the claimant had accessed the landowner's property while under the "impression” that their use was permissive. See id. at 1229. We held that these facts in Drescher supported an inference of permission sufficient to defeat the claimed easement despite the fact that the permission was “illusionary” rather than actual. Id.

. Although Mr. Sposato’s testimony about moving his car is difficult to follow, he explained that sometimes Butterfly’s delivery trucks would enter JR & Sons's property south of the laundromat. The trucks would then reverse direction in front of his office and back up to the loading dock, passing roughly in between the office and the rear of the laundromat. Since Mr. Sposato’s car was parked near the southwest corner of the laundromat, he would occasionally have to move it to allow the delivery trucks sufficient room to maneuver. On the appendix, JR & Sons’s office appears as a building marked “1 st[or]y masonry plaza.”

. We note that there was testimony from both Mr. Sposato and Mrs. Martin that their relationship, at least prior to May 2010, was friendly and neighborly. On appeal, we are required to afford "substantial deference” to a trial justice’s decision to credit a witness’s testimony. Pelletier v. Laureanno, 46 A.3d 28, 39 (R.I.2012).